Nos. 17-1313, -1380

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### ARISTA NETWORKS, INC.

Appellant,

v.

### CISCO SYSTEMS, INC.,

Cross-Appellant.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board No. IPR2015-00975

## APPELLANT ARISTA NETWORKS INC.'S OPENING BRIEF

Michael J. McKeon
Lauren A. Degnan
Ralph A. Philips
Andrew L. Schrader
FISH & RICHARDSON P.C.
901 15th Street, N.W., 7th Floor
Washington, D.C. 20005
degnan@fr.com

*Counsel for Appellant Arista Networks, Inc.*

# CERTIFICATE OF INTEREST

Counsel for the Appellant Arista Networks, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:  Arista Networks, Inc.

2. The name of the real party in interest:  Arista Networks, Inc.

3. Parent corporations and any publicly held companies that own 10% or more of the stock of the party are:  None.

4. The names of all law firms and the partners and associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear for the party in this court and who have not or will not enter an appearance in this case are:

   **Fish & Richardson P.C.:** Ruffin B. Cordell; John A. Dragseth; David J. Goren; Kevin E. Greene*; Jonathan Liu; Xin Ma; Todd Miller; W. Karl Renner; Kevin Su; Michael C. Tyler
   *no longer with the Firm

   **Latham & Watkins LLP**: Douglas E. Lumish; Bert C. Reiser; Patricia Young

   **Tensegrity Law Group, LLP:** William P. Nelson; Matthew D. Powers

Date:  May 19, 2017          /s/ Lauren A. Degnan
                             Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .............................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF RELATED CASES .................................................. v

STATEMENT OF JURISDICTION .......................................................1

INTRODUCTION ...............................................................................3

STATEMENT OF THE CASE AND FACTS .........................................4

   I.   The '211 Patent: Multi-Bridge Link Aggregation .........................4

   II.   The Prior Art .............................................................................15

       A.     Perloff: Multi-Device Link Aggregation ...........................15

       B.     Kunzinger: Tunneling Using IPSec ..................................18

       C.     Perloff/Kunzinger Combination ........................................19

   III.  The *Inter Partes* Review Proceedings ........................................21

       A.     Arista Petitions for *Inter Partes* Review of the '211 Patent ...............21

       B.     Following Institution, the Parties Dispute Whether Kunzinger Discloses "Tunneling" .........................................25

       C.     The Final Written Decision: Claims 1 and 12 Are Anticipated by Perloff ..........................................................28

       D.     The Final Written Decision:  The Board Errs in Its Obviousness Analysis for Claims 2, 6–9, 13, and 17–20 .........................................30

SUMMARY OF THE ARGUMENT ....................................................32

ARGUMENT .....................................................................................33

   I.   Standard of Review ....................................................................33

   II.   The Board Failed To Apply Its Full Construction .......................34

   III.  If the Board Was Applying the Encapsulation/De-encapsulation Element of Its Construction, It Failed To Make the Necessary Findings for This Court To Review Its Decision ...............................................................37

       A.     The Examination the Board Identified in Kunzinger Is Performed as Part of Encapsulation and De-encapsulation .......................................38

       B.     The Board Failed To Address the Encapsulation/De-encapsulation Issue ..................................................................41

C.    This Court Must Vacate the Board's Decision Because It Lacks Sufficient Reasoning To Support Its Finding that Kunzinger Does Not Disclose Tunneling.............................................................................41

CONCLUSION.......................................................................................................42

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012) .......................................................................33

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938)........................................................................................33

*Ferring B.V. v. Watson Labs., Inc.-Florida*,
    764 F.3d 1401 (Fed. Cir. 2014) .......................................................................37

*Insituform Techs., Inc. v. Cat Contracting, Inc.*,
    99 F.3d 1098 (Fed. Cir. 1996) .........................................................................37

*Motor Vehicle Mfr. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................................34

*In re Nuvasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016) ..................................................................34, 42

*Power Integrations, Inc. v. Lee*,
    797 F.3d 1318 (Fed. Cir. 2015) .......................................................................34

*In re Sang Su Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) ..................................................................34, 42

*In Re Van Os*,
    844 F.3d 1359 (Fed. Cir. 2017) .......................................................................34

**Statutes**

Administrative Procedure Act.....................................................................4, 34, 42

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel states:

(a) On December 19, 2014, Cisco Systems, Inc. ("Cisco") filed two complaints requesting that the U.S. International Trade Commission commence investigations against Arista under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. §1337.  The Commission instituted Investigation Nos. 337-TA-944 and -945 based on these complaints.  The Commission's determination in the -944 Investigation is under appeal in Appeal Nos. 16-2539, 16-2563.  The Commission issued the Final Written Decision in the -945 Investigation on May 4, 2017.  The -945 Investigation includes U.S. Patent 8,051,211 ("the '211 patent"), which is the subject of the current appeal before the Court.  The -944 and -945 Investigations involve different and unrelated patents, but the same accused products.  In addition, a patent infringement action Cisco filed against Arista is pending and styled *Cisco Systems, Inc. v. Arista Networks, Inc*., Case No. 5:14-cv-05343 (N.D. Cal. filed Dec. 5, 2014).  The N.D. Cal. action involves the same patent as this appeal, and other patents asserted across the two Commission investigations.  The N.D. Cal. action is stayed pending completion of the Commission investigations and any appeals, pursuant to 28 U.S.C § 1659(a).

(b)  On September 28, 2016, the ITC instituted an enforcement proceeding involving U.S. Patent No. 7,162,537, at issue in Appeal No. 16-2563, designated Investigation No. 337-TA-944 (Enforcement Proceeding).

(c) The Patent Trial and Appeal Board has instituted six *inter partes* review ("IPR") proceedings involving patents involved in the two ITC investigations: (1) IPR2015-00975 involving the '211 patent, which is the subject of the current appeal before the Court; (2) IPR2015-00978 involving U.S. Patent No. 7,340,597; (3) IPR2016-00303 involving U.S. Patent No. 6,377,577; (4) IPR2016-00306 involving U.S. Patent No. 7,023,853; (5) IPR2016-00308 involving U.S. Patent No. 7,162,537; and (6) IPR2016-00309 involving U.S. Patent No. 7,224,668.

(d)  The Final Written Decision in IPR2015-00975 involving the '211 patent issued on October 5, 2016.  Arista filed a notice of appeal of this Final Written Decision on December 5, 2016.  This appeal was docketed in the U.S. Court of Appeals for the Federal Circuit as *Arista Networks, Inc. v. Cisco Systems, Inc.*, Appeal No. 17-1313, on December 6, 2016.  Cisco's cross-appeal was docketed as Appeal No. 17-1380, on December 20, 2016, and these appeals were consolidated that same day.

(e) The Final Written Decision in IPR2015-00978 involving U.S. Patent No. 7,340,597 issued on September 28, 2016.  Arista filed a notice of appeal of this Final Written Decision on October 11, 2016.  This appeal was docketed in the U.S.

Court of Appeals for the Federal Circuit as *Arista Networks, Inc. v. Cisco Systems, Inc.*, Appeal No. 17-1046, on October 14, 2016.  Cisco's "protective" cross-appeal was docketed as Appeal No. 17-1281, on November 29, 2016.  On December 20, 2016, Appeal No. 17-1046 was dismissed without prejudice, and on December 22, 2016, Appeal No. 17-1281 was dismissed without prejudice.  On January 13, 2017, the Board denied Cisco's request for rehearing.  On January 23, 2017, Arista filed a Notice of Appeal, docketed as Appeal No. 17-1525.  On February 3, 2017, Cisco filed a Notice of Cross Appeal, docketed as Appeal No. 17-1577.  These appeals were consolidated on February 6, 2017.

(f) The remaining IPRs are pending and Final Written Decisions are due by June 2017.

## STATEMENT OF JURISDICTION

This appeal arises from a final written decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office in an *inter partes* review proceeding, IPR2015-00975, concerning Cisco's U.S. Patent No. 8,051,211.  The Board issued its final written decision on October 5, 2016.  Appx1–26.  On December 5, 2016, Arista filed a notice of appeal.  On December 19, 2016, Cisco filed a Notice of Cross Appeal.

Arista's Notice of Appeal was filed within the 63-day time limit set by 35 U.S.C. § 142 and 37 C.F.R. § 90.3(a)(1).  This Court, therefore, has jurisdiction over this appeal under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.     Whether the Board erred by not applying its full construction of "tunneling" in its obviousness analysis.

2.     Whether this Court should vacate the Board's decision that claims 2, 6–9, 13, and 17–20 of the '211 patent have not been shown to be unpatentable where the Board's failure to articulate its reasoning makes it impossible for this Court to review its decision that the Kunzinger reference does not disclose tunneling the first LAN with a third LAN through the first intermediate device.

# INTRODUCTION

Arista appeals the Board's conclusion that the Kunzinger reference fails to disclose the "tunneling" limitations.  The Board committed two errors, either of which is sufficient to reverse its finding under substantial evidence review.  The Board either failed to apply its stated construction of the term "tunneling," or it failed to make the necessary findings for this Court to review its decision, if it did apply its construction.

The Board construed "tunneling" to mean "transmitting a frame without examination."  But in doing so, it acknowledged that the '211 patent discloses a method of tunneling packets wherein a "tag field" is added to a frame and later stripped off.  Significantly, the patent teaches examining information in the tag field to determine where to direct a frame.  The patent refers to this entire process as "encapsulation and de-encapsulation."  Because the '211 patent teaches that encapsulation and de-encapsulation are part of the process of "tunneling," the Board held that "encapsulation and de-encapsulation of a frame are not 'examination' of a frame, as the '211 patent uses that term."  Appx9.  However, in the portion of its opinion where it finds that Kunzinger does not disclose "tunneling," the Board includes no discussion of the encapsulation/de-encapsulation issue.  Appx22–25.  This omission suggests that the Board did not apply that aspect of its construction, which is reversible error.

In the alternative, if the Board was applying that portion of its construction, it failed to explain sufficiently why Kunzinger does not disclose tunneling. The "outer header," added via encapsulation, in Kunzinger is nearly identical to the "tag field" the '211 patent uses for encapsulation and de-encapsulation. Yet, the Board gave no reasoning that would explained why the former's use of encapsulation and de-encapsulation disqualifies it from meeting the tunneling limitation whereas the latter's use does not. Because the Board failed to articulate reasoning for its findings, its decision does not comport with the requirements of the Administrative Procedure Act and must be vacated.

## STATEMENT OF THE CASE AND FACTS

## I.    The '211 Patent: Multi-Bridge Link Aggregation

The '211 patent, titled "Multi-bridge LAN Aggregation," relates to using redundancy to increase the performance and reliability of network devices. The patent explains that "it is desirable to have redundant physical connections to a computer network (e.g., redundant physical connections to multiple intermediate network devices) to improve availability." Appx37 at 1:65–2:3. The patent describes one admitted prior art method of using redundancy on a network: link aggregation or trunking. Figure 1 of the '211 patent shows such a system:



Appx28. The figure shows a host 102 connected to a local area network (LAN) via a bridge 106. Appx37 at 2:5–7. The host includes two network interfaces 110. *Id.* at 2:6-8. Because there are two links between the host and the bridge, should one of the LANs fail, the host can still communicate with the bridge. *Id.* at 2:12–14.

One of the downsides to using two links is that the host has an IP address associated with each link. *Id.* at 2:15–18. Multiple IP addresses are not an ideal solution for the network operator. *Id.* at 2:20–21. Multiple IP addresses are more complicated and result in inefficiencies associated with storing and retrieving a list of which IP addresses are associated with which host. *Id.* at 2:24–28.

There was a known technique, referred to as "link aggregation," for alleviating some of the problems associated with multiple IP addresses. *Id.* at 2:28–30. Link aggregation refers to "grouping LANs of the same medium type and speed together to form a link aggregation group, which is treated as a single link with the capacity of all the links combined." *Id.* at 2:30–32. When grouped in such a fashion, the two links between the host and the bridge are seen as a single link, and thus the host appears to have a single IP address despite the multiple links. *Id.* at 2:41–45. When both links are functioning properly, link aggregation serves to double the effective bandwidth; when one link is not functioning, the second link maintains the connection between the host and the bridge. *Id.* at 2:41–51.

One of the downsides of this redundant link setup is that should the bridge fail, the host would be unable to communicate with the rest of the network. *Id.* at 2:49–55. A second admitted prior art method addresses this issue by using two bridges:



Appx29 at Figure 2.  In the two-bridge configuration, if the first bridge were to

fail, the host would still be able to communicate with the rest of the network

through the other bridge.  Appx37–38 at 2:65–3:1.  The patent states that one

disadvantage of this system is that "link aggregation does not support multi-bridge

configurations with a single host," thus introducing all of the disadvantages of

multiple IP addresses.  Appx38 at 3:2–7.

The allegedly inventive solution of the '211 patent is to use multiple

interconnected bridges to enable redundancy among the bridges while maintaining

the benefits of link aggregation. *Id.* at 4:23–28. Figure 3(a) shows how such a

network would be configured:



Appx30 (Fig. 3(a)) (excerpt). The network is configured with two hosts 356, 358

attached to the network through two bridges 342, 344, enabling redundancy.

Appx38 at 4:63–66. In addition, the bridges are connected to one another via link

364, which, as discussed in more detail below, enables bridge 344 to aggregate

multiple physical links with host 356 using known techniques.

Figure 3(b) illustrates the connection between two bridges and a host 356 in

more detail:



Appx31 (Fig. 3(b)). Specifically, the figure shows the connection of bridges 342

and 344 with host 356. The bridges are connected through bridge interconnect

ports 366. Appx39 at 5:33–35. The bridge interconnect ports are configured as a

single LAN with numerous logical sub-ports, including sub-port A99.0. *Id.* at

5:38–41. Bridge 1 (342) contains a logical path connecting sub-port A99.0 to port

A0, directly passing any data received through the bridge "without any

examination by [the] bridge." *Id.* at 5:52–57. As a result, Bridge 2 (344) has two

connections to the host: one direct (i.e., LAN 314) and one through Bridge 1, with

Bridge 1 being transparent from Bridge 2's perspective. *Id.* at 6:1–4. By making

Bridge 1 effectively disappear, known protocols applicable to single bridge to host

configurations can be employed allowing link aggregation as between Bridge 2 and the host.

This configuration combines the benefits of bridge redundancy and link aggregation of the two admitted prior art solutions. The host uses link aggregation to appear as a single IP address to the wider network. *Id.* at 6:15–21. This system offers redundancy benefits as well. As long as a path exists between the host and the network, numerous components can fail without preventing the host from communicating with the network. *See id.* at 6:25–47 (explaining failure modes).

In a larger network environment, this pass through technique can be used to associate each host with a unique bridge for purposes of enabling link aggregation. *Id.* at 5:1–15. The annotated version of Figure 3A below shows how the pass through function can be used to make bridge 342 transparent from the perspective of host 356 (yellow highlighting) while making bridge 344 transparent from the perspective of host 358 (blue highlighting). In such a configuration, two paths are created between each host and each bridge and the two paths then can be aggregated using known link aggregation techniques.



Figure 3A

Appx435.

Figure 4 (reproduced below) is a block diagram showing greater detail of the interworkings of the purportedly inventive bridge with a pass through functionality to allow multi-bridge LAN aggregation.



Figure 4

Appx32.  As can be seen in the figure, the bridge 400 includes physical network

interface ports (PORT 0 through PORT N) that can be used for connections to

hosts, as well as a bridge-interconnect port 412 with logical sub-ports (SUB-

PORT0 through SUB-PORT N) for connection to another bridge participating in

practicing the purported invention via inter-bridge link 418.  Appx40 at 7:10–12,

47–52.  Logic is provided for forwarding data like a traditional bridge, namely,

bridge forwarding engine 406, and for passing data transparently through the

bridge, namely, tunnel engine 410.  *Compare id*. at 7:26–29 ("Bridge-forwarding

engine 406 receives data on one or more ports (e.g., P1-PN), examines the data

according to a number of protocols, and forwards the data out the one or more

12

ports P1-PN.") *with id.* at 7:31–34 ("Tunnel engines 410 are utilized for

transparently passing data through bridge 400 . . . .").

To facilitate passing packets across the inter-bridge link 418, the '211 patent

teaches encapsulating frames. More particularly, when bridge interconnect port

412 receives data for transmission across link 418 from other blocks within the

bridge, such as forwarding engine 406 or tunnel engine 410, the bridge

interconnect port 412 "adds information to the data (e.g., encapsulates data with an

encapsulation tag 506 such as that shown in FIG. 5)." Appx40 at 7:42–46. The

placement of the tag 506 can be seen in FIG. 5, reproduced below:



Appx33.

Tag 506 indicates the sub-port number to which the encapsulated frame

should be sent. Appx41 at 9:29–30. For example, tag 506 may be a VLAN tag,

which includes a VLAN-ID field, which is set to a virtual port number. *Id.* at

9:29–42; Appx42 at 11:9–17. Data entering the bridge from the inter-bridge link

418 is routed internally (e.g., to bridge forwarding engine 406 or tunnel engine

410) according to the tag 506. Appx40 at 7:38–42. Specifically, when the frame is

de-encapsulated, the tunneling bridge examines the tag 506 to determine the virtual

port number and uses this number to send the packet to its appropriate destination.

Appx42 at 11:18–26; Appx41 at 9:15–18 ("de-encapsulates (e.g., examines fields

in frame 500 and/or removes tags from frame 400)"); *see also* Appx43 at Claim

11; Appx36 (Fig. 7B).

The '211 patent contains two independent claims, and the Board found claim

1 illustrative of the claimed subject matter:

> A method comprising:
>
>> aggregating a plurality of LANs, wherein
>>
>> said aggregating comprises aggregating a first LAN and a second LAN,
>>
>> said first LAN couples a host to a first intermediate device and said second LAN couples said host to a second intermediate network device, said plurality of LANs comprising said first LAN and said second LAN, and
>>
>> subsequent to said aggregating, said first LAN and said second LAN are both usable to simultaneously transmit information from said host to said second intermediate network device.

Appx43 at 13:14–26; Appx6 (FWD).

The dependent claims all contain a "tunneling" limitation that requires

tunneling the first LAN with a third LAN through the first intermediate device.

*See, e.g.*, Appx43, claim 2 ("tunneling said first LAN with a third LAN through

said first intermediate network device, said plurality of LANs comprising said third

LAN"),  claim 13 ("a second set of instructions, executable on said intermediate

network device, configured to tunnel a first LAN with a third LAN through said

first intermediate network device, said plurality of LANs comprising said third

LAN").[1]

## II. The Prior Art

### A. Perloff: Multi-Device Link Aggregation

U.S. Patent No. 6,910,149 ("Perloff") is titled "Multi-Device Link

Aggregation." Perloff discloses a "system, device, machine-readable medium, and

method, which allow any link aggregation (LAG) partner device to transparently

connect aggregated links to a pair of devices supporting MDLA[2] as if the common

LAG partner device is merely connecting to a single device." Appx512 at 3:11–

15. Like the system in the '211 patent, Perloff offers redundancy: "if one of the

MDLA devices were to fail, data traffic of the associated aggregated link to the

failed MDLA device can be automatically forwarded by the other non-failed

MDLA device." *Id.*

Figure 4 of Perloff shows a system nearly identical to the system in Figure

3A of the '211 patent:

---

[1] All of the challenged dependent claims directly or indirectly depend on claims 2
or 13. *See* Appx7; Appx43–44.
[2] Perloff uses the acronym "MDLA" for Multi-Device Link Aggregation.



The first and second MDLA devices (102, 104) can detect that they are connected
to one another via an MDLA internal link (110) and that they are connected to
common devices, such as workstation 402. Appx515 at 9:10–16. In operation, the
two connected MDLA devices communicate and coordinate so as to appear a
single device to commonly connected devices. *Id.* at 9:35–54. This
communication and coordination allows links to commonly connected devices to
be aggregated, and renders them usable to transmit packets simultaneously.
Appx511 at 1:59-63. By way of example, links 118c and 120c between
workstation 402 and the first and second MDLA devices can be aggregated and

used for simultaneous transmission of data, as illustrated in the annotated version

of Figure 4 reproduced below.



Appx6381 (Petitioner Demonstrative Exhibit) (excerpt).

Like the '211 patent, if a link fails in the Perloff system, it can route data

through the link connecting the two MDLA devices and to their destination.  By

way of specific example, referring to the annotated version of Figure 5 of Perloff,

below, if link 454 were to fail, data from aggregated links would be sent from

MDLA device 102 through internal MDLA link 110 to MDLA device 104 and

through link 450 to server 420.  Appx516 at 11:20–23.



FIG. 5

Appx6382 (Petitioner Demonstrative Exhibit) (excerpt).

### B.    Kunzinger: Tunneling Using IPSec

U.S. Patent No. 6,931,529 ("Kunzinger"), titled "Establishing Consistent, End-to-End Protection for a User Datagram," discloses a method for protecting data using "cascaded tunnels." Appx519 at Abstract. It explains how tunnels are used by the IP Security Protocol ("IPSec") to secure data in transit. Appx531 at 2:29–36. IPSec uses tunnels "to provide a secure exchange over a path through a non-secure network." *Id.* at 2:54–55. IPSec defines "[a] tunneling mode . . . wherein the IP content within a packet is protected according to a selected set of security services." *Id.* at 2:57–59.

18

In IPsec, packets to be tunneled are encapsulated with an "outer IP header whose source and destination addresses identify the endpoints of the tunnel." Appx532 at 3:6–10.  The original packet, which is comprised of both the inner header and the payload, is encrypted and thus not available to be inspected or examined during transit, as can be seen in the illustration below.  *Id.* at 3:10–17.



Appx6258 (Lin Reply Dec.).  As the packet travels through the tunnel, it is forwarded on the basis of the outer header alone, and the inner header and payload remain protected during transit.  *Id.*  Kunzinger warns that this sort of security is essential because security breaches may occur "in any network segment" where data is transferred, including internal corporate networks, like a corporate intranet. Appx519 at Abstract; Appx532 at 3:50–65.

## C.    **Perloff/Kunzinger Combination**

In light of Kunzinger's warning that even internal corporate networks should be protected, it would have been obvious for a person of ordinary skill to use Kunzinger's security tunnels to secure connections within Perloff's aggregated multi-bridge network.  Appx475–476 (Lin Dec.), ¶¶ 98–101.  As shown in the

annotated figure below, the secure tunnels of Kunzinger could traverse links in

Perloff (highlighted in yellow) to provide additional security:



Appx99 (Petition); Appx6410 (Petitioner Demonstrative Exhibit) (excerpt);

Appx476, ¶ 101.  Thus, the combination of Perloff and Kunzinger discloses an

end-to-end tunnel between work station 402 and server 420 that passes through,

among other links, the first LAN of link 118c and the third LAN of link 110.

Appx476, ¶ 101.

A person of ordinary skill would have been motivated to combine the

references because Kunzinger itself describes how one can employ tunnels using

the IPSec protocol to improve the security of communications through an intranet.

Appx531 at 2:41–44; Appx532 at 3:50–65.  Kunzinger addresses a problem unrecognized by Perloff—that network links within a corporate intranet are at risk and should be protected.  Appx478–479 (Lin Dec.), ¶ 104.  Knowing of Kunzinger's identification of the problem with Perloff, a person of ordinary skill would have found it obvious to combine Kunzinger's solution, secure tunneling using IPSec, with Perloff's network.  *Id.*

## III.    The *Inter Partes* Review Proceedings

### A.    Arista Petitions for *Inter Partes* Review of the '211 Patent

Arista petitioned for *inter partes* review of the '211 patent, and sought cancellation of independent claims 1 and 12 on the basis of Perloff alone and claims 2, 6–9, 13, and 17–20 on the basis of Perloff and Kunzinger in combination.  Appx53 (Petition).

For the independent claims, Arista explained that "Perloff describes a method and a computer program product for a computer network system that aggregates together multiple LANS (e.g., links) to provide a single aggregated link with increased bandwidth," and that the reference "discloses that the load is shared on the aggregated links, and that the aggregated links use a combination of speeds of the individual links."  Appx88.  Therefore, Arista argued, Perloff discloses link aggregation to obtain the benefits of increased bandwidth versus a single link.  Appx38.

21

Arista also explained how Perloff discloses the intermediate device limitation, identifying hosts (e.g., computers), intermediate devices (e.g., MDLA devices), and LANs (e.g., links):

> A "host" includes an "end-station." *See* Section V(3), *supra*. Perloff describes that the network includes one or more hosts (e.g., end nodes). [Appx502], 3:54-58 and 3:66-4:1; [Appx468–469], ¶84.  In particular, Perloff describes a network that includes multiple "LAG partner devices," such as a computer 402, server 406 and printer 408. [Appx514], 8:21-8:22; [Appx469], ¶85.  In addition, comparing Perloff and the '211 Patent, given the same positions of the "end nodes" and "end-station" relative to the aggregated links, a POSITA would understand that the terms "endstation" and "end nodes" are synonymous. [Appx468–469], ¶84. Devices such as the computer 402, server 406, printer 408 and server 420 are the source or destination of information, and as such are the end-nodes discussed by Perloff. [Appx469], ¶85. ***Thus, a POSITA would understand that the various devices such as computer 402, server 406, printer 408 and server 420 are end-stations, i.e., hosts.***
>
> Perloff describes that the network includes a plurality of links, e.g., links 118a,b,c and 120a,b,c, which can be physical information carrying media. [Appx38, 40], 4:10-4:14 and 8:22-8:25; [Appx469], ¶86. Perloff also describes that the network includes two "MDLA devices" 102, 104, which can be switches or routers. [Appx38], 4:35-4:39; [Appx469–470], ¶87.  Because each MDLA device can be a switch or router and is used to connect the physical information carrying media of several links, e.g., links 118a-118c or 120a-120c, each MDLA device is an "intermediate network device." [Appx469–470], ¶87. ***Thus, Perloff includes a first intermediate device, e.g., the first MDLA device 102, and a second intermediate network device, e.g., the second MDLA 104. [Appx469–470], ¶87.***

Appx88–89 (emphasis added).  Arista supplied an annotated version of Perloff's Figure 4 showing how each part of the limitation is met:



Appx90 (Petition).

Arista further explained how Perloff's system is able to use both links to communicate with an intermediate device. When one link fails, "data is sent through an internal link from one MDLA device to another, and then on to the end system." Appx92. Because the packets sent to one MDLA device are forwarded to the second device, either link 118c or 120c are useable simultaneously to send packets to an MDLA device. Appx93.

For the dependent claims, Arista relied on Kunzinger to disclose the limitations involving "tunneling." Appx96. For the construction of "tunneling," Arista explained that the '211 patent expressly defines "tunneling" as "transmitting a frame without examination." Appx57 (quoting Appx39 at 5:59–61).

23

As of the critical date of the '211 patent, Arista explained, techniques were known to create tunnels, and those techniques could be used on the Perloff network to tunnel frames "through the first MDLA 102 from computer 402 to the second MDLA 104." Appx96. As explained by the Kunzinger reference, tunnels can be created using the IPSec protocol. Appx97. "Tunneled packets in IPSec have an outer IP header whose source and destination addresses identify the endpoints of the tunnel, and an inner IP header whose source and destination addresses identify the originator and recipient of the packet." Appx532 (Kunzinger) at 3:6–10.

In its Patent Owner's Preliminary Response, Cisco asked the Board not to construe "tunneling." Appx833. It argued that Perloff does not disclose simultaneously transmitting information to multiple intermediate devices. Appx862. Because it argued that Perloff failed to disclose elements of the independent claims, Cisco did not argue separately that Kunzinger fails to disclose the tunneling limitations. *See* Appx863.

The Board subsequently instituted *inter partes* review on the '211 patent. Appx881. The Board declined to construe "tunneling" at the time of institution. Appx887 ("For purposes of this decision, we agree with Patent Owner and determine that none of the terms proposed by Petitioner requires express construction for purposes of this decision."). The Board also found that Arista established a "reasonable likelihood that Petitioner would prevail in showing that

24

claims 1 and 12 are anticipated by Perloff," and that the other challenged claims were rendered obvious by Perloff and Kunzinger.  Appx891–892.

### B.    Following Institution, the Parties Dispute Whether Kunzinger Discloses "Tunneling"

Following the institution decision, Cisco argued that Kunzinger does not disclose the tunneling limitation.  Cisco maintained that "[t]unneling in the '211 patent 'refer[s] to ***transmitting a frame without examination***.'"  Appx934 (Patent Owner Response) (emphasis in original) (quoting Appx39 at 5:59–61).

Although not a requirement of its construction, Cisco argued that Kunzinger fails to disclose tunneling because it operates on the Layer 3 packet level, whereas the '211 patent operates on the Layer 2 frame level.  Cisco's references to "Layer 3" and "Layer 2" refer to the Open Systems Interconnection or "OSI" model, which is a conceptual model that characterizes the communication functions of telecommunication systems and networks.  Appx936 (P.O. Resp.); Appx990 (Jaffay Dec.).  Layer 2, also referred to as the "data link layer," describes how data is broken into datagrams (often called "frames") and sequentially transmitted from one network note to another Appx 992.  Layer 3, also referred to as the "network layer," describes the manner in which messages (sometimes referred to as "packets") are transferred across multiple nodes in a network, including identifying providing a header on each message identifying its source and destination.  Appx994.  Cisco argued that Kunzinger operates on the packet, i.e. Layer 3 level,

whereas the '211 patent operates on the frame, i.e. Layer 2 level, and therefore Kunzinger does not disclose tunneling.  Appx943 (P.O. Resp.).

Cisco also argued that Kunzinger does not disclose tunneling because it necessarily examines the packets.  In order to route the tunneled packets, IPSec uses the unencrypted outer header.  Appx945.  Cisco argued that because the system uses this header to route the tunneled packets, there is necessarily examination of the packet occurring.  Appx947–948.

In its Reply to the Patent Owner's Response, Arista explained that "tunneling" in the '211 patent "is broad enough to cover either Layer 2 or Layer 3 communication."  Appx5751.  Although the technical definition of a frame is a Layer 2 communication, "tunneling" in the claims of the '211 patent is not limited to transmitting a Layer 2 communication.  Appx5752.  Contrary to Cisco's argument of a firm delineation between packets and frames, persons of skill in the art regularly regard "frame" and "packet" as interchangeable terms.  *Id.*  Arista cited numerous references used by persons of ordinary skill in the art that say that the terms are used interchangeably.  *Id.*[3]  Even Cisco's expert, Dr. Jeffay, used

---

[3] These references include PETERSON & DAVIE, COMPUTER NETWORK A SYSTEMS APPROACH, 682 (2012) ("frame: Another name for a packet . . ."), 689 ("packet: A data unit sent over a packet-switched network.  Also see *frame* and *segment*."), Appx5866, Appx5873; KOZIEROK, THE TCP/IP GUIDE: A COMPREHENSIVE, ILLUSTRATED INTERNET PROTOCOLS REFERENCE, 18 (2005) ("However, this term [packet] is commonly also used to refer generically to any

packet and frame interchangeably, despite Cisco's insistence that they have completely distinct meanings.  Appx5752–5753; Appx5950–5951 ("packets [sic] is a synonym for frame"); Appx6434 (Petitioner Demonstrative Exhibit).

Arista also identified ways in which the '211 patent treats "frame" and "packet" interchangeably.  Appx5753.  For example, at one point, the patent states: "It is assumed that the destination address of the *frame* is the *IP address* corresponding to the virtual network interface of the host."  Appx42 at 11:7–8 (emphasis added).  Under the strict construction of "frame" and "packet" that Cisco urged, this sentence would not be meaningful because under the Layer 2 model, frames are sent to a MAC address, not an IP address.  Appx5754.

Arista explained that the '211 patent explicitly includes Layer 3 as an example of its tunneling process.  The patent describes that its "[m]ultibridge engine 404 includes . . . tunnel engines 410, and a bridge-interconnect port 412.  It will be recognized that a number of different types of mux/demux technologies may be used in the present invention.  For example, *Layer 3 tunnels*, a number of dedicated Ethernets, and/or an array of ATM emulated LANS."  Appx40 at 7:20–26 (emphasis added).

---

type of message."), Appx5884; DEAN, COMPTIA NETWORK+ 2009, 47 (2009) ("The terms frame, packet, datagram and PDU are often used interchangeably to refer to a small piece of data formatted for network transmission."), Appx5902; FEIBEL, THE NETWORK PRESS ENCYCLOPEDIA OF NETWORKING, 884 ("Packets are sometimes also known as frames."), Appx5912.  *See* Appx5752.

Arista further argued that the basic inspection of the IPSec outer header is not "examination" under the patent because the '211 patent discloses that some form of inspection of the frame header occurs during its encapsulation process. Appx5763–5764.  In its description of Figure 5, the '211 patent states that "when a frame is sent from the home bridge to the tunneling bridge, the frame is encapsulated (step 722).  In encapsulating a frame, a tag (e.g., tag 506 of FIG. 5) is generated (step 724) and added to the frame (step 732)."  Appx42 at 11:9–12.  The tag, just like the frame header in IPSec, is used to route the contents of the frame. *See* Appx41 at 9:29–30 ("Tag 506 is a multi-bridge tag preferably used to indicate the sub-port number to which frame 500 should be sent."); Appx42 at 11:18–26; Appx41 at 9:15–18; Appx43 at Claim 11; Appx36 (Fig. 7B).

Because the '211 patent explicitly discloses tunneling with some examination of the frame header, under the broadest reasonable interpretation, "without examination" would have to be broad enough to permit information added as part of encapsulation, to be examined while the rest of the frame is not. Appx5764 (Reply).

### C.    The Final Written Decision: Claims 1 and 12 Are Anticipated by Perloff

The Board correctly found Arista showed claims 1 and 12 are anticipated by Perloff.  Appx17.  The Board construed "subsequent to" to mean "after," rejecting Cisco's attempt to narrow the definition to "as a result of" given that the

28

embodiments that Cisco identified "do not require a cause and effect relationship between the aggregation of LANs and the usability of LANs to simultaneously transmit information, or do not necessarily involve the claimed aggregation of LANs." Appx7–8.

The Board then found that Perloff discloses aggregating a first and second LAN, and thereafter both are usable to simultaneously transmit information from the host to the second intermediate device, rejecting Cisco's argument to the contrary. Appx15–16. Specifically, the Board found that Perloff clearly shows such a transmission under some circumstances. Appx15. The Board additionally found that "Perloff meets this limitation under Perloff's normal operation mode, or even if [it]were to adopt Patent Owner's proposed construction of 'as a result of.'" Appx16 n.3.

The Board dismissed Cisco's claim that Perloff's simultaneous transmission is not "to" the second intermediate device, as based on an impermissible interpretation of the claim requirement. Appx16-17 ("We agree that the claim language does not require the second intermediate device to be the sole device seen by the host."). In addition, the Board found that Perloff discloses information being transmitted from work station 402 to second intermediate network device MDLA device 104. *Id.* The Board also rejected Cisco's argument that "Perloff

'merely describes a prior art "stacked" architecture distinguished" by the '211

patent," finding that Perloff does not describe itself as such a switch.  Appx15.

### D.  The Final Written Decision:  The Board Errs in Its Obviousness Analysis for Claims 2, 6–9, 13, and 17–20

With respect to the Perloff and Kunzinger combination, the Board correctly

found that Arista established a rationale to combine Perloff and Kunzinger.

Appx20.  The Board credited Arista's evidence that Kunzinger teaches the

necessity of securing the interconnections of a local network and thus would have

motivated a person of ordinary skill to adopt Kunzinger's secure tunnels in the

Perloff network.  Appx21.

Addressing the tunneling limitation, the Board construed "tunneling" as

"transmitting a frame without examination, including in layer 2 and layer 3

communications."  Appx8–10.  The Board determined that, in this context,

encapsulation and de-encapsulation of a frame, including adding, examining, and

removing a tag field, are not "examination" of a frame:

> Dependent claim 11 further defines tunneling to comprise
> encapsulating a frame, transmitting the frame, de-encapsulating the
> frame, and directly transmitting the frame. Ex. 1001, 14:11–20.  Thus,
> read in light of the express definition in the Specification, ***these actions
> do not constitute "examination" in the '211 patent.***  The Specification
> does state that for one embodiment of the invention, "bridge-
> interconnect port 412 encapsulates (e.g., includes a tag within, or
> appended to, frame 500) and de-encapsulates (e.g., ***examines*** fields in
> frame 500 and/or removes tags from frame 500) frame 500."  *Id.* at
> 9:14–17 (emphasis added).  Claim 11, however, includes encapsulation
> and de-encapsulation as part of tunneling.  As a result, ***we understand***

30

*that encapsulation and de-encapsulation of a frame are not "examination" of a frame, as the '211 patent uses that term*.

Appx9 (second emphasis in original; first and third emphases added).

The Board's construction also clarifies that tunneling is not limited to a particular layer of communications, rejecting Cisco's invitation to limit it to Layer 2 communications only. The Board found that the '211 patent expressly contemplates Layer 3 communications as well:

> Petitioner argues, *inter alia*, that the '211 patent expressly provides that "Layer 3 tunnels" "may be used in the present invention" as a "mux/demux" technology in a bridge. Pet. Reply 9, citing Ex. 1001, 7:20–26. The Specification also discloses another embodiment with intermediate network devices that are "Layer 2 (or L2) Ethernet switches." Ex. 1001, 5:28–29. The Specification further states that a router (described by Patent Owner's declarant as a layer 3 connection device) is an intermediate network device. *Id.* at 1:48–49; Ex. 2003 ¶ 53. Accordingly, we construe tunneling to mean, "transmitting a frame without examination, including in layer 2 and layer 3 communications."

Appx9–10.

Despite ruling for Arista on both of the claim construction issues, and finding that "Kunzinger teaches that tunneling occurs with respect to layer 3 communications," Appx23, the Board found that Kunzinger does not disclose tunneling under its construction, stating "[b]ecause the unencrypted outer header of the IPSec packet is examined for forwarding decisions, we are not persuaded that transmission of the IPSec packet in the proposed combination occurs without examination, as we have construed 'tunneling' to require." Appx25. Notably, the

31

Board did not examine whether examining this outer header as part of encapsulation qualifies as the "encapsulation and de-encapsulation of a frame" that the Board had determined "are not 'examination' of a frame, as the '211 patent uses that term." Appx9.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The Board committed two reversible errors in this case. First, the Board erred by failing to apply its stated construction of "tunneling" to the Kunzinger reference. When it construed "tunneling," the Board acknowledged that "encapsulating a frame, transmitting the frame, de-encapsulating the frame, and directly transmitting the frame" constitute tunneling as defined by the '211 patent. Appx8. The Board also acknowledged that, in the context of the '211 patent, encapsulation and de-encapsulation necessarily include adding a tag field to the frame and examining the tag field to route the frame correctly. *See* Appx8–9. Yet, the Board failed to apply this aspect of its construction when it analyzed Kunzinger and never addressed whether Kunzinger's use of its outer header was analogous to the encapsulation and de-encapsulation of the '211 patent and, therefore, permitted under the construction. The Board's failure to do so indicates that it did not apply its full construction when it evaluated the Kunzinger reference, which is reversible error.

Even if the Board was applying its full construction, it committed reversible error by not articulating its reasoning why Kunzinger does not disclose tunneling. The unencrypted outer header of Kunzinger, which is added as part of IPSEC encapsulation, is similar to and serves the same purpose of the tag in the '211 patent. Despite their similarity, the Board found that the use of this outer header means that Kunzinger does not transmit packets "without examination." Critically, the Board made no findings with respect to the portion of its "tunneling" construction that provides that "encapsulation and de-encapsulation of a frame are not 'examination' of a frame." Appx9. As a result, the Board has frustrated this Court's ability to review its finding for substantial evidence. Because the Board failed to explain the reasoning behind its decision sufficiently, this Court should vacate the decision and remand.

## ARGUMENT

### I.    Standard of Review

This Court reviews the Board's factual findings underlying its obvious conclusion for substantial evidence. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938).

To facilitate judicial review of agency findings, the Administrative Procedure Act requires the agency "to develop an evidentiary basis for its findings." *In re Sang Su Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (citing *Motor Vehicle Mfr. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29 (1983)). In reaching its decision, the Board "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43. The Board "must provide 'a reasoned basis for the agency's action.'" *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (quoting *Bowman Transp., Inc. v. Ark.- Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). The Board's explanation must be sufficient for the reviewing court "to see that the agency has done its job." *Id.* When the Board fails to provide a sufficient explanation, its decision cannot stand. *See In Re Van Os*, 844 F.3d 1359, 1361–62 (Fed. Cir. 2017) (vacating decision and remanding); *In re Nuvasive*, 842 F.3d at 1384–85 (same); *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323–25 (Fed. Cir. 2015) (same); *In re Sang Su Lee*, 277 F.3d 1338 at 1344 (same).

## II.    The Board Failed To Apply Its Full Construction

The Board erred by not applying its entire construction of "tunneling" to the disclosure of Kunzinger. In construing "tunneling," the Board plainly acknowledged that the encapsulation and de-encapsulation process described in the

'211 patent is encompassed within the patent's use of the term "tunneling."
Appx9.  The Board noted that the written description defines "tunneling" as
"transmitting a frame without examination."  Appx8 (quoting Appx39 ('211
patent), 5:60–61).  However, the Board also noted that the term must be defined
consistently with its use in '211 patent's claims.  Appx8.

Claim 11 provides that "said tunneling comprises: encapsulating a frame
with a virtual port number; transmitting said frame to said first intermediate
network device; de-encapsulating said frame to determine said virtual port number;
and directly transmitting said frame from said virtual port to said physical port."
Appx43 ('211 patent) at 14:12–20; *see also* Appx42 at 11:4–26 (describing
encapsulation, transmission, and de-encapsulation of a tunneled frame); Appx36
(Fig. 7B).  The patent explains that de-encapsulation includes examining fields in
the frame.  Appx41 at 9:15–18 ("de-encapsulates (e.g., examines fields in frame
500 and/or removes tags from frame 400)").  In light of these disclosures, the
Board acknowledged that, in the context of the '211 patent, encapsulation and de-
encapsulation necessarily include adding a tag field to the frame and examining the
tag field to route the frame correctly.  Appx8 ("[E]ncapsulating a frame,
transmitting the frame, de-encapsulating the frame, and directly transmitting the
frame . . . do not constitute 'examination' in the '211 patent."); Appx9 ("The
Specification does state that for one embodiment of the invention, 'bridge-

interconnect port 412 encapsulates (e.g., includes a tag within, or appended to, frame 500) and de-encapsulates (e.g., *examines* fields in frame 500 and/or removes tags from frame 500) frame 500.' *Id.* [Appx41] at 9:14–17 (emphasis added).""). Therefore, the Board concluded "that encapsulation and de-encapsulation of a frame are not 'examination' of a frame, as the '211 patent uses that term." Appx9.

The Board's construction thus carves out certain kinds of examination from the "without examination" requirement of the construction—portions of a frame can be examined if they are examined as part of encapsulation or de-encapsulation. As a result, applying the Board's claim construction involves two inquiries:

(1) Is a frame transmitted without examination?

(2) If there is some examination, is the examination part of "encapsulation and de-encapsulation of a frame"? Appx9.

In its analysis of Kunzinger, however, the Board did not undertake this second inquiry and failed to analyze whether Kunzinger's examination of the unencrypted outer header was part of encapsulation and de-encapsulation. The Board's analysis of the reference omits any discussion about encapsulation and de-encapsulation:

> In other words, there is a portion of the frame, the outer header, which is indeed examined. . . . Because the unencrypted outer header of the IPSec packet is examined for forwarding decisions, we are not persuaded that transmission of the IPSec packet in the proposed combination occurs without examination, as we have construed "tunneling" to require.

Appx24–25. Indeed, it appears that the Board never even considered the possibility that Kunzinger uses encapsulation and de-encapsulation. By failing to consider whether Kunzinger's use of the unencrypted outer header was part of encapsulation and de-encapsulation, the Board failed to apply the full scope of its construction to the reference.

Because it failed to apply its stated construction, the Board has committed reversible error. *See Ferring B.V. v. Watson Labs., Inc.-Florida*, 764 F.3d 1401, 1411 (Fed. Cir. 2014) ("Moreover, although it is not readily discernable from the record that the district court applied its stated construction in its infringement analysis. . . . That alone would constitute reversible error as it would not follow its own claim construction."); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1109 (Fed. Cir. 1996) ("Although Judge Hughes used the correct claim construction in concluding that Inliner had not literally infringed, Judge Gilmore appears to have applied a different and incorrect claim construction in concluding that there was no infringement under the doctrine.").

## III. If the Board Was Applying the Encapsulation/De-encapsulation Element of Its Construction, It Failed To Make the Necessary Findings for This Court To Review Its Decision

If the Board was applying the encapsulation/de-encapsulation aspect of its construction, the Board did not explain its reasoning sufficiently enough for this Court to review. Specifically, the Board failed to make any findings as to whether

Kunzinger's examination of the unencrypted outer header was part of encapsulation and de-encapsulation and, therefore, within the scope of "tunneling," under the Board's construction. As a result, the Board has not created a sufficient record for this Court to review, and its decision must be vacated.

### A. The Examination the Board Identified in Kunzinger Is Performed as Part of Encapsulation and De-encapsulation

Had the Board analyzed Kunzinger's use of encapsulation and de-encapsulation, as required by its claim construction, it would have seen that Kunzinger's unencrypted outer header is nearly identical to, and serves the same function as, the '211 patent's "tag" field used during encapsulation and de-encapsulation.

Both the "tag" field and outer header are appended to a message header. In the '211 patent, the bridge-interconnect port encapsulates and de-encapsulates by adding or removing a tag to or from the rest of the message. Appx41 at 9:14–18. As can be seen in Figure 5 of the '211 patent, the "tag" field 506 appears before the message content 512:

| 502 | 504 | 506 | 508 | 510 | 512 | 514 |
|---|---|---|---|---|---|---|
| DESTINATION MAC ADDRESS | SOURCE MAC ADDRESS | TAG | 802.1Q TAG | LENGTH/ETHERTYPE | DATA | CRC |
| 6 BYTES | 6 BYTES | 4 BYTES | 4 BYTES | 2 BYTES | N BYTES | 4 BYTES |

Appx33.  Similarly, Kunzinger teaches encapsulating an encrypted message within an unencrypted, outer IPSEC header, such that the outer header also appears before the message content (original packet), as this illustration shows:



Appx6258 (Lin Reply Dec.).

The fact that Kunzinger performs encapsulation and de-encapsulation was confirmed by Cisco's expert: "Using the security associations, the endpoints are also responsible for encapsulating and de-encapsulating the IPsec packets according to the encryption scheme."  Appx1002 (Jaffay Dec.).  "But in an IPsec packet, the payload is the IP packet to be tunneled.  This is referred to as the 'inner packet,' or the 'encapsulated packet.'"  Appx1003.

In addition to their structural similarities, the outer header and the tag have the same function, directing the system to route the packet to the correct destination.  The '211 patent describes the function of the tag as indicating the location to which the frame should be sent:

> ***Tag 506 is a multi-bridge tag preferably used to indicate the sub-port number to which frame 500 should be sent***.  In one embodiment of the

present invention, tag 506 is a 4-byte virtual local area network (VLAN) tag as defined in IEEE std 802.1Q-1998.

Appx41 at 9:29–33 (emphasis added); *see also* Appx40 at 7:38–42 ("Bridge-interconnect port 412 internally routes data . . . depending on, for example, information associated with the data (e.g., ***an encapsulation tag 506*** such as that shown in Fig. 5)." (emphasis added)); Appx42 at 11: 18–26. Just like the tag in the '211 patent, Kunzinger's unencrypted outer header is used to route packets to the correct location:

> ***Tunneled packets in IPSec have an outer IP header whose source and destination addresses identify the endpoints of the tunnel***, and an inner IP header whose source and destination addresses identify the originator and recipient of the packet. When IPSec is used in "tunnel" mode, the complete inner packet, which is comprised of both the inner header and the payload, is protected as the packet travels through the tunnel. However, the outer header remains in clear text form as the packet travels through the tunnel.

Appx532 at 3:7–14 (emphasis added). Importantly, "[t]he complete inner packet, which is comprised of both the inner header and the payload, is protected as the packet travels through the tunnel," *id.*, such that the address of the recipient of the packet (along with the rest of the fields contained in the inner packet), *id.*, are not examined at all. Appx6258 (Linn Reply Dec.), ¶¶ 38–39; Appx5763–5765 (Reply). Likewise, in the '211 patent, the fields in the frame other than the tag 506 (e.g., data field 512) are not examined. *See* Appx41 at 9:23–28.

Therefore, the examination of the unencrypted, outer header occurs as part of encapsulation and de-encapsulation, and Kunzinger discloses "tunneling" under the Board's construction.

### B.    The Board Failed To Address the Encapsulation/De-encapsulation Issue

Despite the similarities between the '211 patent's tag and Kunzinger's outer heading, both in structure and function, the Board did not address why the examination done as part of the encapsulation and de-encapsulation in the '211 patent is permissible but the analogous examination during Kunzinger's encapsulation and de-encapsulation is impermissible.  Indeed, the Board *made no findings whatsoever* about whether Kunzinger's use of the unencrypted outer header is part of encapsulation and de-encapsulation and, therefore, within the scope of "tunneling," under the Board's construction.  Appx23–24.  Nevertheless, the Board found that Kunzinger's teaching of routing by way of an encapsulated, outer header is "examination" under the claim.  *Id.*

### C.    This Court Must Vacate the Board's Decision Because It Lacks Sufficient Reasoning To Support Its Finding that Kunzinger Does Not Disclose Tunneling

The Board's failure to make findings and articulate its reasoning for treating Kunzinger's disclosure of the unencrypted outer header differently than the '211 patent's tag field frustrate this Court's ability to review the Board's finding.  Arista argued that Kunzinger discloses tunneling using encapsulation and de-

encapsulation that is permitted under the patent. *See, e.g.*, Appx5763–65 (Reply). The Board evidently disagrees. But because the Board has made no findings with respect to the encapsulation and de-encapsulation portion of its construction, Arista is unable to explain to this Court why the Board misinterpreted the reference. Likewise, without findings explaining why the Board reached its decision, this Court is unable to review the Board's reasoning.

The Administrative Procedure Act requires the Board to articulate its reasoning so that a reviewing court can see the basis for the agency's decision. *In re Sang Su Lee*, 277 F.3d at 1344. Here, because the Board has not adequately explained the reasoning behind its decision, that decision cannot stand and should be vacated. *See In re Nuvasive,* 842 F.3d at 1384–85 (vacating PTAB decision and remanding "for additional PTAB findings and explanations" where "the PTAB failed to articulate a reason why the PHOSITA would have been motivated to modify" the prior art in light of another reference).

## CONCLUSION

For the reasons above, the Court should vacate the Board's finding that Kunzinger does not disclose "tunneling" and remand with instructions to reconsider its determination.

Dated: May 19, 2017                   Respectfully submitted,

/s/Lauren A. Degnan
Michael J. McKeon
Lauren A. Degnan
Ralph A. Philips
Andrew L. Schrader
FISH & RICHARDSON P.C.
901 15th Street, N.W., 7th Floor
Washington, D.C. 20005
Tel: 202-783-5070

*Counsel for Appellant Arista Networks, Inc.*

Addendum

Trials@uspto.gov                                                    Paper 36
571-272-7822                                        Entered: October 5, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

ARISTA NETWORKS, INC.,
Petitioner,

v.

CISCO SYSTEMS, INC.,
Patent Owner.

_____

Case IPR2015-00975
Patent 8,051,211 B2

_____

Before BRYAN F. MOORE, MATTHEW R. CLEMENTS, and
PETER P. CHEN, *Administrative Patent Judges*.

CHEN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2015-00975
Patent 8,051,211 B2

## I.  INTRODUCTION

Petitioner, Arista Networks, Inc., filed a Petition for *inter partes*
review of claims 1, 2, 6–9, 12, 13, and 17–20 of U.S. Patent No. 8,051,211
B2 (Ex. 1001, "the '211 patent").  Paper 2 ("Pet.").  Patent Owner, Cisco
Systems, Inc., filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").  On
October 6, 2015, we instituted an *inter partes* review of claims 1, 2, 6–9, 12,
13, and 17–20.  Paper 7 ("Inst. Dec." or "Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response
(Paper 16, "PO Resp."), to which Petitioner filed a Reply (Paper 20,
"Reply").  Pursuant to our authorization, Patent Owner filed a paper alleging
certain arguments and evidence cited in Petitioner's Reply were beyond the
scope permitted, and Petitioner filed a response to Patent Owner's
assertions.  Paper 29; Paper 30.  An oral argument was held on July 27,
2016, consolidated with the oral hearing for IPR2015-00978.  *See* Paper 35
("Tr.").

### A.  Related Matters

The parties state that the '211 patent is the subject of *Cisco Systems,
Inc. v. Arista Networks, Inc.*, No. 4:14-cv-05343-JSW (N.D. Cal.), filed
December 5, 2014, and ITC Inv. No. 337-TA-945 (Network Devices,
Related Software and Components Thereof (II)), filed December 19, 2014.
Pet. 1; Paper 5 (Patent Owner's Mandatory Notice).  Petitioner has also filed
petitions requesting *inter partes* review of other patents owned by Patent
Owner:  IPR2015-00973 (U.S. Patent No. 6,377,577), IPR2015-00974 (U.S.
Patent No. 7,224,668), IPR2015-00976 (U.S. Patent No. 7,023,853),
IPR2015-00978 (U.S. Patent No. 7,340,597), IPR2015-01049 (U.S. Patent
No. 6,377,577), IPR2015-01050 (U.S. Patent No. 7,023,853), IPR2015-

IPR2015-00975
Patent 8,051,211 B2

01710 (U.S. Patent No. 7,224,668), IPR2016-00018 (U.S. Patent No.
8,051,211), IPR2016-00119 (U.S. Patent No. 7,047,526), IPR2016-00244
(U.S. Patent No. 7,953,886), IPR2016-00301 (U.S. Patent No. 6,377,577),
IPR2016-00303 (U.S. Patent No. 6,377,577), IPR2016-00304 (U.S. Patent
No. 7,023,853), IPR2016-00306 (U.S. Patent No. 7,023,853), IPR2016-
00308 (U.S. Patent No. 7,162,537), and IPR2016-00309 (U.S. Patent No.
7,224,668).

### *B. The '211 Patent*

The '211 patent is titled "Multi-Bridge LAN Aggregation" and relates
generally to computer networks, and more specifically, to a method and
system for a multi-bridge local area network ("LAN").  Ex. 1001, 1:5–8.
Individual LANs may be coupled together at the link layer with intermediate
network devices known as bridges, to create a bridged LAN that connects
more computers together, over a much wider geographical range than a
single LAN.  *Id*. at 1:29–40.  Data on LANs is carried in frames.  *Id*. at 1:21.

The '211 patent discloses a method and system for improving network
reliability and availability on a multi-bridged LAN, with redundant physical
connections between host computers and multiple intermediate devices such
as bridges and routers, where the hosts are associated with single Internet
protocol ("IP") addresses.  *Id*. at 2:20–21, 4:22–25, 6:18–21, 6:48–62; *see*
Prelim. Resp. 6–10; Pet. 3–4.

IPR2015-00975
Patent 8,051,211 B2

Figure 3A of the '211 patent is reproduced below.



Figure 3A

Figure 3A is a block diagram of computer network 300 with LANs 302–338 connected by multiple intermediate devices, such as bridges 340–344 and router 346, and hosts 354–358 that send and receive information on network 300. Ex. 1001, 4:34–39, 4:45–48. Host 356 is coupled to network 300 in a multi-bridge LAN aggregation, where if bridge 342 or LAN 312 were to fail, host 356 would communicate with LAN 310 via LAN 314 and bridge 344. *Id*. at 4:63–66. Bridge 344 and host 356 "are configured for link aggregation, allowing both LAN 312-314 to be simultaneously utilized for transmitting information to and from host 356 and allowing host 356 to be seen from LAN 310 as having a single IP address." *Id*. at 5:1–5.

4

IPR2015-00975
Patent 8,051,211 B2

Figure 3B of the '211 patent is reproduced below.



Figure 3B is a block diagram of a portion of computer network 300, with
LAN 310 coupled to intermediate network devices 342 and 344. Ex. 1001,
5:26–28. Intermediate network devices 342 and 344 are bridges and are also
connected to host 356, which is "seen by LAN 310 as having a single IP
address." *Id*. at 5:46–49, 6:18–21. In one embodiment, bridges 342 and 344
are Layer 2 Ethernet switches. *Id*. at 5:28–30. There are two paths between
host 356 and LAN 310, and if either bridge 342 or bridge 344 fails, host 356
can still transmit and receive information from LAN 310. *Id*. at 6:10–14,
21–47.

Bridge 342 is configured with pass-through path 353 between port A0
and sub-port A99.0, and frames transmitted to port A0 are sent directly to

5

IPR2015-00975
Patent 8,051,211 B2

sub-port A99.0 without examination by bridge 320.  *Id.* at 5:52–57.  The
'211 patent continues, "[a]s used herein, tunneling is used to refer to
transmitting a frame without examination."  *Id.* at 5:59–61.  "[A] number of
different types of mux/demux technologies may be used in the present
invention.  For example, Layer 3 tunnels, a number of dedicated Ethernets,
and/or an array of ATM emulated LANS."  *Id.* at 7:22–26.

### C.  Illustrative Claim

Of the challenged claims, claims 1 and 12 of the '211 patent are
independent.  Claim 1 is illustrative of the claimed subject matter:

> 1.  A method comprising:
>
> aggregating a plurality of LANs, wherein
>
> said aggregating comprises aggregating a first LAN and a second
> LAN,
>
> said first LAN couples a host to a first intermediate device and
> said second LAN couples said host to a second intermediate
> network device, said plurality of LANs comprising said first
> LAN and said second LAN, and
>
> subsequent to said aggregating, said first LAN and said second
> LAN are both usable to simultaneously transmit information
> from said host to said second intermediate network device.

Ex. 1001, 13:13–26.

### D.  Asserted Grounds of Unpatentability

We instituted trial on the following specific grounds.

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Perloff[1] | 35 U.S.C. § 102(e) | 1 and 12 |

---

[1] U.S. Patent No 6,910,149 B2, filed Sept. 24, 2001, issued June 21, 2005
(Ex. 1006, "Perloff").

IPR2015-00975
Patent 8,051,211 B2

| Reference(s) | Basis | Challenged Claims |
|---|---|---|
| Perloff and Kunzinger[2] | 35 U.S.C. § 103(a) | 2, 6–9, 13, and 17–20 |

## II. DISCUSSION

### A. Claim Construction

In an *inter partes* review, we construe claim terms in an unexpired patent according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard). Consistent with the broadest reasonable construction, claim terms are presumed to have their ordinary and customary meaning as understood by a person of ordinary skill in the art in the context of the entire patent disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  An inventor may provide a meaning for a term that is different from its ordinary meaning by defining the term in the specification with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

### "subsequent to"

In our Decision to Institute, we construed "subsequent to" to mean "after."  Dec. to Inst. 7–8.  As it did in its Preliminary Response, Patent Owner again proposes that we should instead construe subsequent to" to mean "as a result of," citing to a few phrases in the Specification.  PO Resp. 17–22.  Petitioner asserts our construction from the Decision to Institute is

---

[2] U.S. Patent No. 6,931,529 B2, filed Jan. 5, 2001, issued Aug. 16, 2005 (Ex. 1007, "Kunzinger").

IPR2015-00975
Patent 8,051,211 B2

correct. Pet. Reply 3–5. We agree with Petitioner, as the embodiments in the Specification cited by Patent Owner do not require a cause and effect relationship between the aggregation of LANs and the usability of LANs to simultaneously transmit information, or do not necessarily involve the claimed aggregation of LANs. *Id*. at 4; *see also* Ex. 1025 ¶ 11. Accordingly, we maintain our construction of "subsequent to" from the Decision to Institute, namely, "after."

*"tunneling"*

The term "tunneling" is recited in the challenged dependent claims. Petitioner notes the "explicit definition" in the Specification (Pet. 7), which states:

> As used herein, tunneling is used to refer to transmitting a frame without examination. For example, when a bridge receives a frame, it generally examines the frame to determine the corresponding LAN Segment to forward the frame to. Additionally, a bridge will process the frame according to a number of protocols. However, in accordance with the present invention, bridge 342 is configured to internally transmit a frame between bridge inter-connect port 366 and port A0 directly, without such examination.

Ex. 1001, 5:59–6:1. Petitioner states "the proper construction of the term 'tunneling' must be broad enough to include 'transmitting a frame without examination.'" Pet. 7.

Dependent claim 11 further defines tunneling to comprise encapsulating a frame, transmitting the frame, de-encapsulating the frame, and directly transmitting the frame. Ex. 1001, 14:11–20. Thus, read in light of the express definition in the Specification, these actions do not constitute "examination" in the '211 patent. The Specification does state that for one embodiment of the invention, "bridge-interconnect port 412 encapsulates

8

IPR2015-00975
Patent 8,051,211 B2

(e.g., includes a tag within, or appended to, frame 500) and de-encapsulates (e.g., *examines* fields in frame 500 and/or removes tags from frame 500) frame 500." *Id.* at 9:14–17 (emphasis added).  Claim 11, however, includes encapsulation and de-encapsulation as part of tunneling.  As a result, we understand that encapsulation and de-encapsulation of a frame are not "examination" of a frame, as the '211 patent uses that term.

Petitioner further states, "[s]hould the Board determine that construing 'tunneling' is necessary, it should not be limited to Layer 2 communication, and is broad enough to cover either Layer 2 or Layer 3 communication." Pet. Reply 6–10.  With respect to network "layers," Patent Owner's expert, Dr. Kevin Jeffay, explains that

> Communication in a network proceeds according to a number of rules that control the format and processing of messages. Together, these rules define a protocol for communication.  In most networks, multiple protocols operating in concert are required to communicate messages between hosts.  These protocols are organized hierarchically as a series of hardware and software 'layers' and are colloquially referred to as a 'protocol stack.'

Ex. 2003 ¶ 49.  According to Dr. Jeffay, the "Internet" model defines a 5-layer protocol stack, wherein layer 2 is the link layer and layer 3 is the network layer.  *Id.* ¶¶ 49–55.  Dr. Jeffay further testifies that Layer 3 interconnection devices are called routers.  *Id.* ¶ 53.

Petitioner argues, *inter alia*, that the '211 patent expressly provides that "Layer 3 tunnels" "may be used in the present invention" as a "mux/demux" technology in a bridge.  Pet. Reply 9, citing Ex. 1001, 7:20–26.  The Specification also discloses another embodiment with intermediate network devices that are "Layer 2 (or L2) Ethernet switches."  Ex. 1001, 5:28–29.  The Specification further states that a router (described by Patent

9

IPR2015-00975
Patent 8,051,211 B2

Owner's declarant as a layer 3 connection device) is an intermediate network device. *Id.* at 1:48–49; Ex. 2003 ¶ 53. Accordingly, we construe tunneling to mean, "transmitting a frame without examination, including in layer 2 and layer 3 communications."

We do not expressly construe any other terms in the challenged claims.

## B. Principles of Law

To prevail in its challenges to the patentability of the claims, a petitioner must establish facts supporting its challenges by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). A claim is unpatentable under 35 U.S.C. § 102 if a single prior art reference either expressly or inherently discloses every limitation of the claim. *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 975 (Fed. Cir. 2010). A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We analyze the instituted grounds of unpatentability, with Petitioner being required to prove unpatentability by a preponderance of the evidence, in accordance with the above-stated principles.

IPR2015-00975
Patent 8,051,211 B2

### *C. Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we determine the level of ordinary skill in the pertinent art at the time of the invention. *Graham,* 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 718 (Fed. Cir. 1991).*

Petitioner's Declarant, Dr. Bill Lin, testifies that a person of ordinary skill in the art at the time of the '211 patent would have had would have had a "Masters of Science Degree (or a similar technical Masters Degree, or higher degree) in an academic area emphasizing computer networking or, alternatively, a Bachelor Degree (or higher degree) in an academic area emphasizing the design of electrical, computer, or software engineering and having several years of experience in computer network engineering and the design of computer networks." Ex. 1003 ¶ 9; Pet 4. Patent Owner's Declarant, Dr. Jeffay, testifies similarly that one of ordinary skill in the art at the time of the '211 patent would have had one of ordinary skill in the art would have "a B.S. degree, or its equivalent, in Computer Science, Computer Engineering, Electrical Engineering, or a related field, as well as a Master of Science degree, or equivalent, in one of those fields or approximately 2 years of academic or industry experience in network devices." Ex. 2003 ¶ 23; PO Resp. 22.

Based on our review of the '211 patent and the types of problems and solutions described in the '211 patent and cited prior art, we conclude a person of ordinary skill in the art at the time of the '211 patent would have had a Bachelor's degree in electrical engineering, computer engineering,

IPR2015-00975
Patent 8,051,211 B2

computer science, or related field, and at least two years of work experience in computer networks and network devices. We further note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau,* 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### D. Asserted Anticipation by Perloff

Petitioner contends that claims 1 and 12 are unpatentable under 35 U.S.C. § 102 as anticipated by Perloff. Pet. 38–45. Relying on the testimony of Dr. Bill Lin, who submitted two declarations herein, Petitioner explains how Perloff allegedly discloses each limitation of the claims. *Id.* (citing Ex. 1003); Pet. Reply 10–15 (citing Ex. 1025).

### 1. Perloff (Ex. 1006)

Perloff is titled "Multi-device Link Aggregation," and relates generally to communications in networks. Ex. 1006, 1:6. A multi-device link aggregation (MDLA) device is connected to another MDLA by an internal link. *Id.* at Abstract. The MDLA devices exchange protocol data units to detect devices connected to both MDLA devices and are "able to trick" the detected devices connected to both MDLA devices into behaving as though the two MDLA devices are a single device. *Id.* If one of the MDLA devices fails, traffic can be automatically forwarded by the other MDLA device. *Id.* Figure 4 of Perloff is reproduced below.

IPR2015-00975
Patent 8,051,211 B2



Figure 4 depicts network 400 with first MDLA device 102 and second MDLA device 104, which can be switches or routers, connected by MDLA internal link 110. Ex. 1006, 4:35–37, 8:60–62. MDLA devices 102 and 104 are connected to common link aggregation partner devices 401 such as server 406, printer 408, and computer 402. *Id.* at 8:21–25, Fig. 4. Computer 402 is connected to MDLA device 102 by first link 118c and to MDLA device 104 by second link 120c. *Id.* Partner devices 401 are unaware of two separate MDLA devices. *Id.* at 10:65–11:15.

Both MDLA devices are also connected to server 420. *Id.* at 8:36–40. When there is a failure of one of the links to server 420, e.g., failure of link 454, data flows both along first link 118c from computer 402 to MDLA device 102, and then through MDLA internal link 110 to second MDLA device 104, and along second link 120c from computer 402 to second MDLA device 104. *Id.* at 11:15–23.

IPR2015-00975
Patent 8,051,211 B2

### 2. Whether Petitioner's Reply Is Beyond the Scope of Patent Owner's Response

Preliminarily, Patent Owner asserts portions of Petitioner's Reply are beyond the scope permitted by 37 C.F.R. § 42.23(b). Paper 29. Patent Owner contends Petitioner's Reply (page 13, line 10, through page 15, line 6) exceeded the scope of the Patent Owner Response. Paper 29, 1. Patent Owner asserts Petitioner "shifted its position as to the type of information it contends is 'simultaneously transmit[ted]' and the timing of when such data is sent," namely, a data unit in Perloff called an LACPDU (link aggregation control protocol unit) that is transmitted during Perloff's normal operation mode. *Id.* at 1, citing Pet. 42–44, Pet. Reply 14.

Petitioner contends its Reply was permissible because the additional disclosure "is a direct and proper rebuttal to Patent Owner's arguments premised on reading the term 'subsequent' to mean 'as a result of.'" Paper 30, 1.

We have reviewed the parties' contentions on this issue, and determine that the cited portion of Petitioner's Reply (page 13, line 10, through page 15, line 6) was proper rebuttal argument in response to assertions in the Patent Owner Response.

### 3. Analysis

Petitioner contends that Perloff discloses all the limitations of independent claims 1 and 12. Pet. 38–44. Petitioner asserts Perloff discloses aggregating a plurality of LANs comprising a first LAN coupling a host to a first intermediate device and a second LAN coupling the host to a second intermediate device, and that subsequent to said aggregating, the first and second LANs are both usable to simultaneously transmit information

IPR2015-00975
Patent 8,051,211 B2

from the host to the second intermediate device.  Pet. 38–44, citing Ex. 1003 ¶¶ 83–95.

Claim 12 recites a computer program product comprising non-transitory computer readable media storing a set of instructions executable on an intermediate network device and configured to aggregate a plurality of LANs.  Ex. 1001, 14:21–38.  Petitioner asserts Perloff discloses the implementation of its functional components in software, such as a computer program product in a machine readable medium.  Pet. 45, citing Ex. 1003 ¶ 96; *see* Ex. 1001, 12:40–62.

Patent Owner argues Perloff "merely describes a prior art 'stacked' architecture distinguished" by the '211 patent.  PO Resp. 27.  Petitioner counters that the "stacked" architecture is irrelevant because Perloff "does not describe itself as a stacked switch."  Pet. Reply 11.  Perloff, according to Petitioner, merely describes that its invention can be applied to devices in a stack, as well as other situations.  *Id.*, citing Ex. 1006, 11:59–64 ("Moreover, multi-device link aggregation (MDLA) according to embodiments of the invention, can be deployed in many situations and is equally applicable for both interconnected devices using standard network links (e.g., Ethernet) and for more specific interconnections, such as stacker-link for interconnecting devices in a stack.").  We agree with Petitioner.

Patent Owner argues Perloff does not disclose that subsequent to aggregating the first and second LAN, both are usable to simultaneously transmit information from the host to the second intermediate device.  PO Resp. 28–31.  Patent Owner's argument is premised on its proposed construction of "subsequent to" to mean "as a result of" (PO Resp. 28–31), which we have rejected.  *See* Section II.A above.  Under the construction of

15

IPR2015-00975
Patent 8,051,211 B2

"subsequent to" to mean "after," Perloff does disclose that in a failure mode after MDLA devices have been aggregated, first link 118c and second link 120c are usable to transmit simultaneously packets from computer 402 to MDLA devices 102 and 104.  Pet. 41–44, citing Ex. 1003 ¶¶ 91–95. Petitioner contends, "Perloff discloses an embodiment in which, after aggregation, there is simultaneous transmission to a second intermediate network device (104) from the host (402) on two links."  Pet. Reply 11–12, citing Ex. 1025 ¶ 23.  In particular, as shown in Figure 4 of Perloff, when there is a failure of one of the links to server 420, e.g., failure of link 454, data flows both along first link 118c from computer 402 to MDLA device 102, and then through MDLA internal link 110 to second MDLA device 104, and along second link 120c from computer 402 to second MDLA device 104.  Ex. 1006, 11:15–23.[3]  As a result, we are persuaded that Perloff discloses this limitation.

Patent Owner also argues that Perloff's simultaneous transmission is not "to" the second intermediate device.  PO Resp. 31–33.  Patent Owner argues Perloff does not disclose that links from the alleged host—i.e., Perloff's workstation 114 or 402—are usable simultaneously to transmit information "to" the second intermediate device (i.e., Perloff's MDLA device 104 in Figure 4 of Perloff).  Rather, when failure occurs, the host "simply continues to transmit packets on the links to either MDLA device 102 or MDLA device 104. . . .  Thus, Perloff does not disclose any

---

[3] We agree with Petitioner's further assertion that Perloff meets this limitation under Perloff's normal operation mode, or even if we were to adopt Patent Owner's proposed construction of "as a result of" for "subsequent to."  *See* Pet. Reply 12–14, citing Ex. 1025 ¶¶ 24, 26.

IPR2015-00975
Patent 8,051,211 B2

mechanism that causes workstation 402 to ignore MDLA [d]evice 102 and transmit packets on both links 'to' MDLA device 104." PO Resp. 32–33, citing Ex. 2003 ¶¶ 80–81.

Petitioner asserts Patent Owner's "overwrought construction" reads limitations from the '211 patent Specification into the claim, whose recitation of "transmit information from said host to said second intermediate network device" means "simply that that information goes from the host to the second intermediate network device." Pet. Reply 14–15. We agree that the claim language does not require the second intermediate device to be the sole device seen by the host. Ex. 1001, 13:23–26.

Petitioner further asserts that Figure 4 of Perloff shows information being transmitted from workstation 402 "to" second intermediate network device MDLA device 104. *Id.* at 14, citing Ex. 1025 ¶ 27. We agree with Petitioner's arguments and evidence, including the testimony of Dr. Lin, regarding Perloff's disclosure of the limitations of claims 1 and 12, and adopt them as our own. Accordingly, we are persuaded Petitioner has shown by a preponderance of the evidence the unpatentability of claims 1 and 12 as anticipated by Perloff.

### E. *Asserted Obviousness over Perloff and Kunzinger*

Petitioner contends that dependent claims 2, 6–9, 13 and 17–20 are unpatentable under 35 U.S.C. § 103 as obvious over Perloff and Kunzinger. Pet. 45–60.

### 1. *Kunzinger (Ex. 1007)*

Kunzinger is titled "Establishing Consistent, End-to-End Protection for a User Datagram" and discloses a technique to establish tunnels to protect "datagrams (i.e., packets)" through an entire network path. Pet. 19–

17

IPR2015-00975
Patent 8,051,211 B2

21, 46–48; Ex. 1007, Abstract.  Figure 4 of Kunzinger is reproduced below.

**FIG. 4**



Figure 4 depicts a remote access computing environment in which data is transmitted between host 405 and server 440 through intermediate security gateway 420 using secure tunnels 415 and 435 that securely transport data through Internet 410 and 430 respectively.  Ex. 1007, 8:59–9:1.  All component devices including hosts and gateways, implement the IP Security ("IPSec") Protocol established by the Internet Engineering Task Force (IEFT).  *Id.* at 10:11–15.  IPSec provides security services, including data encryption, data integrity, data origin authentication, and access control, protecting packets between two hosts, or between a host and a security gateway, or between two security gateways.  *Id.* at 2:37–53.

Tunnels are used by IPSec to provide a secure exchange over a path through a non-secure network such as the Internet.  *Id.* at 2:53–55.  In addition:

> Tunneled packets in IPSec have an outer IP header whose source and destination addresses identify the endpoints of the tunnel, and an inner IP header whose source and destination addresses identify the originator and recipient of the packet. When IPSec is used in "tunnel" mode, the complete inner packet, which is comprised of both the inner header and the payload, is protected

18

as the packet travels through the tunnel. However, the outer
header remains in clear text form as the packet travels through
the tunnel. The protection applied to the complete inner packet
can be encryption alone, authentication alone, or both encryption
and authentication, as specified by the relevant security
association negotiated between the tunnel endpoints.

*Id.* at 3:7–18.

### 2. *Whether Petitioner's Reply Is Beyond the Scope*
### *of Patent Owner's Response*

Preliminarily, Patent Owner asserts portions of Petitioner's Reply are
beyond the scope permitted by 37 C.F.R. § 42.23(b). Paper 29. Patent
Owner contends Petitioner's Reply (page 18, line 9, through page 20, line 6)
exceeded the scope of the Patent Owner Response. Paper 29, 1. Patent
Owner asserts Petitioner "shifted what it contends is a 'frame' for purposes
of the claimed 'tunneling.'" *Id*. at 2, citing Pet. 47–48, Pet. Reply 20.[4]
Patent Owner contends Petitioner's Reply "argues that the 'frame' is the
outer frame an IPSec packet is transmitted in." *Id.*

Petitioner contends its Reply was permissible because "Petitioner did
not shift what it contends is the recited 'frame,' and the Petition does not
take the position that 'frame' refers to only the inner-header and payload."
Paper 30, 2. Petitioner contends its Petition "acknowledges that, in the
disclosure of Kunzinger, some portion of a frame is examined (outer header)
while another is not (inner header), and reads that on the claim." *Id.* We
have reviewed the parties' contentions on this issue, agree with Petitioner,
and determine that Petitioner's Reply (page 18, line 9, through page 20, line
6) did not modify Petitioner's contentions as to what constitutes a frame.

---

[4] Paper 29 refers to "Pet. p. 20," which apparently should instead refer to
"Pet. Reply p. 20."

IPR2015-00975
Patent 8,051,211 B2

### 3.    *Analysis*

Dependent claim 2 recites "tunneling said first LAN with a third LAN through said first intermediate network device," and dependent claim 13 recites a limitation of commensurate scope.  Ex. 1001, 13:27–30, 14:39–45. Dependent claims 6–9 and 17–20 depend from claims 2 and 13, respectively. Relying on the declaration testimony of Dr. Lin (Ex. 1003), Petitioner explains how Perloff and Kunzinger teach or suggest the tunneling and other limitations of dependent claims 2, 6–9, 13, and 17–20.  Pet. 45–60, citing Ex. 1003; *see also* Ex. 2005, 48:1–3 (deposition of Petitioner's declarant in which he confirmed the application of Kunzinger's IPSec tunnels to the network of Perloff).

For example, regarding claim 2, Petitioner contends Perloff's MDLA internal link 110 is the recited third LAN.  Pet. 46, citing Ex. 1003 ¶ 98. Petitioner further contends Kunzinger discloses the recited tunneling of the first LAN with the third LAN, in describing implementation of tunnels from a host to another host over an internet or an intranet, using the IPSec protocol.  Pet. 47, citing Ex. 1003 ¶ 49.  In Kunzinger, the complete inner packet (inner header and payload) is protected, and thus the content of a packet being tunneled is not examined.  Pet. 21, citing Ex. 1003 ¶ 51.

Petitioner asserts that in Figure 4 of Perloff (reproduced above), a tunnel as disclosed by Kunzinger would extend from workstation 402 and would tunnel first link 118c (the recited "first LAN") with internal MDLA link 110 (the recited "third LAN") through first MDLA device 102 (the recited "first intermediate device") to a host on Internet 418.  Pet. 50–51.

Petitioner also provides a rationale for combining Perloff with Kunzinger, citing *KSR*.  Pet. 51–53, 59–60, citing Ex. 1003 ¶¶ 104–105.  In

20

IPR2015-00975
Patent 8,051,211 B2

particular, Petitioner explains why one of ordinary skill in the art would have

been motivated to combine Perloff and Kunzinger:

> A [person of ordinary skill in the art] would have modified
> Perloff to incorporate the tunnel of Kunzinger, because the
> combination amounts to the use of a known technique to improve
> similar devices in the same way. *See KSR*, 550 U.S. at 417 . . .
> Kunzinger describes that the IPSec protocol can be used to
> improve security of communications by a tunnel through an
> intranet.  Ex. 1007, 1:23-35.  Kunzinger is similar to Perloff
> because both concern operation of a communication network
> with multiple devices. Ex. 1003, ¶104.  In addition, Kunzinger
> motivates creation of a tunnel from a host, such as the computer
> 402 of Perloff, to another host on the same intranet, such as the
> edge server 420 of Perloff.  Ex. 1003, ¶104. . . .  Kunzinger
> explains that intranets should not be assumed to be secure.  Ex.
> 1007, 3:50-56.  A POSITA would have recognized that the
> computer network of Perloff suffers from the same problems
> identified by Kunzinger. Ex. 1003, ¶104.  Through Kunzinger's
> discussion of this problem and the benefit of the solutions
> proposed, which were understood as of the Critical Date, a
> POSITA would have been motivated to modify the computer
> network of Perloff to use tunneling between two hosts, as taught
> by Kunzinger.  Ex. 1003, ¶104.

Pet. 51–52.  Petitioner contends the combination of Perloff and Kunzinger

similarly teaches the limitations of dependent claims 6 (reciting details of

aggregating, Ex. 1001, 13:51–58; *see* Pet. 53-55, citing Ex. 1003 ¶¶ 106–

107), 7 (reciting details of tunneling, Ex. 1001, 13:59–62; *see* Pet. 55–56,

citing Ex. 1003 ¶ 108), 8 (reciting further details of tunneling, Ex. 1001,

13:63–67; *see* Pet. 57–58, citing Ex. 1003 ¶¶ 110–111), and 9 (reciting

further details of tunneling, Ex. 1001, 14:1–5; *see* Pet. 58–59, citing Ex.

1003 ¶¶ 110–111).  Petitioner states that dependent claims 13 and 17–20

"are computer program product claims with limitations equivalent to those

21

in claims 2 and 6–9, respectively."  Pet. 59; *see* Ex. 1001, 14:39–45, 15:9–
35.

     Patent Owner argues Kunzinger's tunnels "perform tunneling on
network layer (layer 3) communications, and thus cannot transmit a frame,
which is a layer 2 communication."  PO Resp. 33.  *See id.* at 36–42, 43–45.
Patent Owner argues, "[t]he term 'frame' has a well-understood meaning . . .
[a] frame is a link layer (layer 2) communication."  *Id.* at 36.  Patent Owner
adds, "[t]he '211 patent uses the term[] 'frame' consistent with its plain and
ordinary meaning – a layer 2 communication." (citing Ex. 2003 ¶ 89).
Patent Owner further argues, "[i]n contrast to the tunneling of the '211
patent that operates on Layer 2 frames, the IPSec tunnel of Kunzinger only
operates on Layer-3 communications at the network layer, which lack the
information required to be considered a Layer 2 frame."  *Id.* at 44 (citing Ex.
2003 ¶¶ 88, 93).

     As set forth above, our construction of tunneling includes layer 3
communications.  In addition, Petitioner notes the '211 patent itself
expressly describes "layer 3 tunnels" in the mux/demux technology in a
bridge.  Pet. Reply 9, citing Ex. 1001, 7:20–26.  Petitioner also argues that
the '211 patent uses "frame" and "packet" interchangeably.  Pet. Reply 8–9,
citing Ex. 1001, 11:7–8.  Petitioner further argues that Patent Owner's
declarant (i) testified at his deposition in a related proceeding at the U.S.
International Trade Commission that, "at a high level, we can partition the
packets, and packets is a synonym for frame, so we will hear both terms"
and (ii) used the terms frame and packet interchangeably in his declaration
herein.  Pet. Reply 7, citing Ex. 1019, 1292; Ex. 2003 ¶ 31.  We agree with
Petitioner's arguments and reasoning, and in light of our construction of

IPR2015-00975
Patent 8,051,211 B2

tunneling, we determine Kunzinger teaches that tunneling occurs with respect to layer 3 communications.

Patent Owner further argues that Perloff's MDLA (intermediate) device "necessarily performs examination" of transmitted frames, and the '211 patent "teaches a type of transmission where such examination is not done." PO Resp. 45; *see id.* at 45–52. Patent Owner continues, "[t]he MDLA devices in the proposed combination of Perloff and Kunzinger perform exactly the prohibited type of examination" during both layer 2 and layer 3 processing of IPsec tunnel transmissions. PO Resp. 46.

Petitioner asserts that in Kunzinger, tunneled packets have an outer header, an inner header, and a payload. When IPSec is used in tunnel mode, the complete inner packet comprising the inner header and payload, is protected (e.g., encrypted) and not examined, as the packet travels through the tunnel. Pet. Reply 19–20; Ex. 1007, 3:7–18. The outer packet header, however, is unencrypted ("in clear text form"). Ex. 1007, 3:13–14. As even Patent Owner acknowledges, the unencrypted outer header allows the IPSec packet to be properly routed over a network. PO Resp. 47, citing Ex. 2005, 67:3–68:1.

At the deposition of Petitioner's declarant, he testified that "the forward decisions will be based on the outer header." PO Resp. 49, citing Ex. 2005, 67:20–68:1. The '211 patent's definition of tunneling excludes examination of a frame for forwarding decisions:

> As used herein, tunneling is used to refer to transmitting a frame without examination. For example, when a bridge receives a frame, it generally examines the frame to determine the corresponding LAN Segment to forward the frame to. Additionally, a bridge will process the frame according to a number of protocols. However, in accordance with the present

23

> invention, bridge 342 is configured to internally transmit a frame
> between bridge inter-connect port 366 and port A0 directly,
> without such examination.

Ex. 1001, 5:59–6:1.  Patent Owner argues Kunzinger's IPSec protocol

"plainly constitutes examining the frame, as it is the traditional type of

forwarding that is prohibited by the '211 patent's 'tunneling' feature."  PO

Resp. 52, citing Ex. 2003 ¶¶ 95–100.

At oral hearing, Petitioner confirmed, "What is clear from what we've

argued is that undeniably there is a portion of the frame, again even if you're

going to call it a layer 2 frame, that does not get looked at and cannot get

looked at, again, because it is encrypted."  Tr., 26:4–7.  Petitioner also

asserted (in its response (Paper 30) to Patent Owner's brief citing portions of

the Reply allegedly beyond the scope of Patent Owner's Response) that

"[t]he Petition also clearly acknowledges that, in the disclosure of

Kunzinger, some portion of a frame is examined (outer header) while

another is not (inner header)."  Paper 30, 2 (citing Pet. 20, 21).

In other words, there is a portion of the frame, the outer header, which

is indeed examined, as Patent Owner asserted at oral hearing:

> [T]he examination that's prohibited is the normal forwarding
> decisions that are performed by a layer 2 device, in other words,
> looking at the source and destination header information in the
> frame to determine how to forward that packet.
> Now, if we turn to our slide number 28. This is exactly as we
> talked about the type of examination that's occurring in
> Kunzinger and its IPSec tunnel. And when that IPSec packet
> goes through the tunnel, at every point it traverses in that tunnel
> the device that gets it at the network layer has to look at the outer
> header, that network packet of the IP's packet, to determine how
> to forward it.

IPR2015-00975
Patent 8,051,211 B2

Tr., 55:14–24. We agree with Patent Owner. Because the unencrypted outer header of the IPSec packet is examined for forwarding decisions, we are not persuaded that transmission of the IPSec packet in the proposed combination occurs without examination, as we have construed "tunneling" to require.

## III. CONCLUSION

Based on the evidence and arguments, Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 12 of the '211 patent are anticipated by Perloff. Petitioner has not demonstrated by a preponderance of evidence that claims 2, 6–9, 13, and 17–20 would have been obvious over Perloff and Kunzinger.

## IV. ORDER

Accordingly, it is

ORDERED that claims 1 and 12 of the '211 patent are unpatentable;

FURTHER ORDERED that claims 2, 6–9, 13, and 17–20 of the '211 patent have not been shown to be unpatentable; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2015-00975
Patent 8,051,211 B2


PETITIONER:

Walter Renner
David Goren
Linhong Zhang
Todd Miller
Lauren Degnan
axf@fr.com
IPR40963-0008IP1@fr.com

PATENT OWNER:

Lori Gordon
Daniel Block
Jon Wright
Robert Sterne
Lgordon-ptab@skgf.com
Dblock-ptab@skgf.com
Jwright-ptab@skgf.com
Rsterne-ptab@skgf.com

26



US008051211B2

(12) **United States Patent**   (10) **Patent No.:**   **US 8,051,211 B2**
Finn   (45) **Date of Patent:**   **Nov. 1, 2011**

(54) **MULTI-BRIDGE LAN AGGREGATION**

(75) Inventor: **Norman W. Finn**, Livermore, CA (US)

(73) Assignee: **Cisco Technology, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2244 days.

(21) Appl. No.: **10/282,438**

(22) Filed: **Oct. 29, 2002**

(65) **Prior Publication Data**

US 2004/0098501 A1    May 20, 2004

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ........................ 709/249; 709/238; 714/4.12

(58) **Field of Classification Search** .................. 709/245, 709/246, 249, 238, 220; 714/4.11, 4.12
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,657,951 B1 * | 12/2003 | Carroll et al. ................. | 370/222 |
| 6,978,308 B2 * | 12/2005 | Boden et al. ................. | 709/229 |
| 6,996,628 B2 * | 2/2006 | Keane et al. ................. | 709/238 |
| 7,027,412 B2 * | 4/2006 | Miyamoto et al. ......... | 370/255 |
| 7,028,333 B2 * | 4/2006 | Tuomenoksa et al. .......... | 726/3 |
| 7,028,334 B2 * | 4/2006 | Tuomenoksa ................. | 726/3 |
| 7,028,337 B2 * | 4/2006 | Murakawa ..................... | 726/15 |
| 7,209,435 B1 * | 4/2007 | Kuo et al. ................. | 370/219 |
| 2003/0048746 A1 * | 3/2003 | Guess et al. ................. | 370/219 |

OTHER PUBLICATIONS

Hewlett Packard, LAN Aggregation through Switch Meshing, Jun. 1998, pp. 1-11.*

Amendment to Carrier Sense Multiple Access with Collision Detection (CSMA/CD) Access Method and Physical Layer Specifications, IEEE Computer Society, Mar. 30, 2000, pp. 1-173.*
*Lan Aggregation Through Switch Meshing*, Hewlett Packard, Jun. 1998, pp. 1-12, http://www.hp.com/rnd/library/pdf/techlib__meshing.pdf.
*Dynamic LACP Trunking*, Hewlett Packard, 2000, pp. 1-6, http://www.hp.com/rnd/support/config__examples/2524__lacp.pdf.
*Software Configuration Guide—Release 5.2, Configuring Fast EtherChannel and Gigabit EtherChannel, Software Configuration Guide*, Cisco Systems, Jun. 27, 2002, pp. 7-1-7-16, http://www.cisco.com/univercd/cc/td/doc/product/lan/cat5000/rel__5__2/config/channel.pdf.
*Software Configuration Guide—Release 5.2, Configuring VLAN Trunks on Fast Ethernet and Gigabit Ethernet Ports*, Cisco Systems, Jun. 27, 2002, pp. 12-1-12-28, http://www.cisco.com/univercd/cc/td/doc/product/lan/cat5000/rel__5__2/config/e__trunk.pdf.
*Amendment to Carrier Sense Multiple Access with Collision Detection (CSMA/CD) Access Method and Physical Layer Specifications—Aggregation of Multiple Link Segments*, LAN MAN Standards Committee of the IEEE Computer Society, Mar. 30, 2000, pp. i-ix and 1-173, IEEE Std 802.3ad-2000.
International Search Report as mailed from the PCT on Aug. 2, 2004 for counterpart WO Application (PCT/US03/34423; Filed Oct. 29, 2003), 3 pages).

* cited by examiner

*Primary Examiner* — Kevin Bates
(74) *Attorney, Agent, or Firm* — Campbell Stephenson LLP

(57) **ABSTRACT**

A method and system for multi-bridge LAN aggregation is disclosed. The method includes aggregating a plurality of LANs coupling a host to a first and a second intermediate network device. The system includes an intermediate network device. The intermediate network device includes a multi-bridge engine. The multi-bridge engine includes a tunnel engine coupled to a bridge interconnect port and a first physical port.

**32 Claims, 9 Drawing Sheets**





ARISTA-1001



PRIOR ART

Figure 1



PRIOR ART

Figure 2

U.S. Patent

Nov. 1, 2011

Sheet 3 of 9

US 8,051,211 B2



Figure 3A





Figure 3B

U.S. Patent     Nov. 1, 2011     Sheet 4 of 9     US 8,051,211 B2

U.S. Patent

Nov. 1, 2011    Sheet 5 of 9

US 8,051,211 B2



Figure 4

U.S. Patent

Nov. 1, 2011

Sheet 6 of 9

US 8,051,211 B2

Appx33



Figure 5

U.S. Patent

Nov. 1, 2011

Sheet 7 of 9

US 8,051,211 B2



Figure 6



CONFIGURE TUNNELING BRIDGE ⟋ 702

CONFIGURE VIRTUAL PORTS ON TUNNELING BRIDGE ⟋ 704

CONFIGURE PASS-THOUGH PATH ⟋ 706

MAP VIRTUAL PORT DIRECTLY TO PHYSICAL PORT ⟋ 708

CONFIGURE HOST ⟋ 710

AGGREGATE NETWORK INTERFACE PORTS OF HOST ⟋ 712

GENERATE IP ADDRESS FOR VIRTUAL NETWORK INTERFACE ⟋ 714

CONFIGURE HOME BRIDGE ⟋ 716

CONFIGURE VIRTUAL PORTS ON TUNNELING BRIDGE ⟋ 718

AGGREGATE PORTS OF HOME BRIDGE ⟋ 720

Figure 7A

9



Figure 7B



Figure 7C

US 8,051,211 B2

1

# MULTI-BRIDGE LAN AGGREGATION

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to computer networks, and, more specifically, to a multi-bridge LAN aggregated method and system for use in a computer network.

### 2. Description of the Related Art

Computer Networks

Generally, a computer network is a group of computers (or hosts) coupled to each other in a way that allows information to be exchanged between the computers. A local area network is a common example of a computer network. As its name implies, a LAN is a computer network which is organized within a given geographic area or locale, such as a college campus, a site of a corporation, a single building, etc. Various types of LANs include Ethernet, FDDI, and Token Ring. The LAN type refers to the physical medium and connections over which traffic (i.e., data) is carried using hardware specific to the LAN type. Data on LANs are carried in frames. As used herein, a frame refers to information which is transferred between a host and a bridge and/or between multiple bridges. Each frame includes, at least, a destination link layer address, a source link layer address, a frame type indication, and data. Each frame transmitted to a given LAN can be observed and/or received by every other computer or intermediate network device attached to that LAN.

A number of individual LANs may be coupled together with bridges to create a Bridged LAN. Bridges are intermediate network devices which can be used to interconnect LANs at the link layer to enable computers on one LAN to communicate with the computers of another LAN. Bridges forward frames, as necessary, from one LAN to another, using the destination link layer address of the frames. Bridges learn which LAN Segments to forward the frames on based on the source link layer addresses of the frames. In general, a Bridged LAN can connect many more computers together, and cover a much wider geographical range, than a single LAN. The term "LAN Segment" is often used to refer to a non-bridged LAN (a LAN that includes no bridges). Although a LAN may refer to a computer network organized in a given locale, as used herein, the term "LAN" is used to refer to a physical connection between one or more hosts (e.g., a LAN Segment). Also, as used herein, the term "host" refers to an end-station which is the source of, or destination of, frames transmitted over a network.

A router is an intermediate network device which also interconnects a number of LANs and/or other types of transmission media. For example, a router may be used to connect one Ethernet LAN (or Bridged LAN) to another, or to connect a FDDI LAN to a digital satellite link. Routers generally forward packets, which are essentially data coupled with header information which describes properties of the packet such as a source network layer address, a destination network layer address, and a packet length. The router forwards packets from one LAN to another, adding or removing frame information such as link layer addresses, as needed. A router knows which LAN to send the packets on based on information within the packet itself and a configuration table accessible by the router which correlates address information to LAN information. The term "switch" is sometimes used for an intermediate network device that combines some or all of the functions of both a router and a bridge.

Often, it is desirable to have redundant physical connections to a computer network (e.g., redundant physical connections to multiple intermediate network devices) to

2

improve availability. Unfortunately, some current methods of providing redundancy are inefficient, limited in use, and create undesirable consequences.

Link Aggregation

FIG. 1 illustrates a host 102 coupled to a LAN 104 via a bridge 106 and LANs 108 and 109. Host 102 includes network interfaces 110 (e.g., S0 and S1), both of the same medium (e.g., Ethernet). Bridge 106 includes ports 114 (e.g., ports A0–A2). As seen in FIG. 1, two LANs are provided from host 102 to bridge 106, LAN 108 from network interface S0 to port A0, and LAN 109 from network interface S1 to port A1. In configuring host 102 and budge 106 in this manner, should one of the LANs 108-109 fail, another LAN is available to transport data.

Unfortunately, a consequence of utilizing multiple network interfaces 110 of host 102 to connect to LAN 104 is an increase in the number of IP addresses which host 102 is associated. This increase results from an internet protocol (IP) address being associated with each network interface of a host. Having multiple IP addresses associated with a single host is disadvantageous for a number of reasons. Initially, confusion results as to which IP addresses should be used to communicate with the host and management of the host is made more difficult. Further, use of multiple IP addresses for a host creates inefficiency due to the time it takes to determine the IP addresses associated with the host, and the space consumed in storing the multiple IP addresses.

Link aggregation (also known as trunking) alleviates some of the problems associated with multiple IP addresses by grouping LANs of the same medium type and speed together to form a link aggregation group, which is treated as a single link with the capacity of all the links combined. Commonly known protocols and software may be used to enable link aggregation on bridge 106 and host 102. For example, Link Aggregation Control Protocol (LACP) is a common link aggregation protocol defined in IEEE Std.802.3-2000, clause 43. Similarly, Port Aggregation Protocol (PAgP) is a well known protocol developed by Cisco Systems, Inc. and useful for dynamically aggregating redundant links connecting two or more devices.

With bridge 106 and host 102 configured for link aggregation, the multiple links between them are seen as one link, and consequently host 102 may be seen from a network as having one IP address, even though multiple interfaces of host 102 may be connected to the network. Additionally, aggregating the multiple links through link aggregation has the advantage of increasing the bandwidth between host 102 and bridge 106 to twice that of what the bandwidth would be without link aggregation. Further if one of the links between host 102 and bridge 106 were to fail, communication would resume on the remaining links. Unfortunately, although link aggregation provides a redundant coupling to bridge 106, no redundancy is provided between LAN 104 and bridge 106. Thus, if bridge 106 were to fail, host 102 would lose communication with LAN 104.

Another method of providing redundant connections between a host and a LAN is to couple a host to multiple bridges with multiple wires. FIG. 2 includes a host 202 coupled to LAN 204 via bridges 206-208 and LANs 210-212. Host 202 includes network interfaces 214 (e.g., S0 and S1). Bridges 206 and 208 includes ports 218 (e.g., ports A0-A1 and B0-B1, respectively). As can be seen from FIG. 2, redundancy is provided from host 202 to LAN 204, accomplished in part by bridges 206 and 208.

The advantages provided by the configuration illustrated in FIG. 2 include the utilization of redundant bridges. If bridge 206 where to fail, host 202 would still be able to communicate

11

US 8,051,211 B2

**3**

with LAN **204**, and vice versa if bridge **208** were to fail. However, two IP addresses are associated with host **202**, one for each network interface S0 and S1, which introduces the aforementioned disadvantages associated with managing hosts with multiple IP addresses. Link aggregation is not available in such a scenario because link aggregation does not support multi-bridge configurations with a single host. Link aggregation is traditionally only available between two devices (e.g., one bridge and one host). In addition, although two LANs are shown coupled to host **202**, the bandwidth of host **202** is not automatically doubled. The use of LANs **210-212** is determined by the host IP address chosen, and thus may be under the control of neither host **102** nor bridges **206-208**.

Another traditional implementation of providing redundant physical connections to a network involves stacking multiple bridges together and configuring the multiple bridges to appear as one bridge. In order to accomplish this, however, the bridges must be configured to communicate with each other for sharing and learning network and frame information. Although this configuration may be a reasonable solution for providing redundancy if the bridges are in close proximity to each other (e.g., stacked on top of or next to each other) and the necessary cabling and configuration is provided, it has many pitfalls. If one of the bridges and or cables connecting the bridges were to fail, the network connection would be lost, since the bridges could no longer "learn" from each other (e.g., learning link layer addresses from each other). Additionally, such a configuration is not desirable if the bridges are to be at arms length from each other and independent of each other (i.e., not have to depend on other bridges for learning network and address information).

### SUMMARY OF THE INVENTION

In one embodiment of the present invention, a method of multi-bridge LAN aggregation is disclosed. The method includes aggregating a plurality of LANs coupling a host to a first and a second intermediate network device.

In another embodiment of the present invention, a system is disclosed. The system includes an intermediate network device. The intermediate network device includes a multi-bridge engine. The multi-bridge engine includes a tunnel engine coupled to a bridge interconnect port and a first physical port.

The foregoing is a summary and thus contains, by necessity, simplifications, generalizations and omissions of detail; consequently, those skilled in the art will appreciate that the summary is illustrative only and is not intended to be in any way limiting. As will also be apparent to one of skill in the art, the operations disclosed herein may be implemented in a number of ways, and such changes and modifications may be made without departing from this invention and its broader aspects. Other aspects, inventive features, and advantages of the present invention, as defined solely by the claims, will become apparent in the non-limiting detailed description set forth below.

### BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be better understood, and its numerous objects, features and advantages made apparent to those skilled in the art by referencing the accompanying drawings. The use of the same reference number throughout the figures designates a like or similar element.

FIG. **1**, labeled as prior art, is a block diagram of an implementation of link aggregation.

**4**

FIG. **2**, labeled as prior art, is a block diagram of an exemplary network connection in the absence of link aggregation.

FIGS. **3**(A-B) are block diagrams of a computer network including an embodiment of multi-bridge LAN aggregation in accordance with the present invention.

FIG. **4** is a block diagram of a bridge for use in multi-bridge LAN aggregation in accordance with the present invention.

FIG. **5** is a block diagram of an encapsulated unit transmitted in multi-bridge LAN aggregation in accordance with the present invention.

FIG. **6** is a block diagram of another embodiment of a bridge for use in multi-bridge LAN aggregation in accordance with the present invention.

FIGS. **7**(A-C) are flow charts illustrating a process of aggregating a plurality of LANs coupling a host to a first and second intermediate network device, according to one embodiment of the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

#### Introduction

The present invention generally enables link aggregation to be utilized on redundant physical connections between a host and multiple network devices, thus improving reliability and availability of data transmitted to and from the host. As used herein, link aggregation is used to refer to implementations of link aggregation such as IEEE Standard 802.3-2000, clause 43 and Etherchannel. The following is intended to provide a detailed description of an example of the invention and should not be taken to be limiting of the invention itself. Rather, any number of variations may fall within the scope of the invention which is defined in the claims following the description.

#### Exemplary Network Architecture

FIG. **3** is a block diagram of a computer network **300** including an embodiment of multi-bridge LAN aggregation in accordance with the present invention. Network **300** includes LANs **302-338** interconnected by a number of intermediate network devices, such as bridges **340-344**, and routers **346**. The intermediate network devices include ports **352** which allow the intermediate network devices to physically connect to one another and to other network devices. As used herein, port refers to a point of attachment to a LAN through which an intermediate network device (e.g., a bridge) transmits and receives data (e.g., media access control data). Network **300** also includes hosts **354-358** which, in the described embodiment of the present invention, are server computer systems configured to send and receive information on network **300**.

It is desirable that a host, host **356** for example, be coupled to network **300** such that if one path connecting host **356** to network **300** were to fail, including the failure of an intermediate device (e.g., bridge **342**), an alternate path would be available. Additionally, it is also desirable that such a configuration provide host **356** on network **300** with a single IP address, and also utilize any redundant links coupled to host **356** to increase the bandwidth of information sent to and from host **356**. Accordingly, host **356** is coupled to network **300** in a multi-bridge LAN aggregation configuration in accordance with one embodiment of the present invention. Similarly, host **358** is also coupled to network **300** in a multi-bridge LAN aggregation configuration in accordance with one embodiment of the present invention.

As seen from FIG. **3**A, host **356** is coupled to LAN **310** via, at least, LANs **312-314** and bridges **342-344**. If bridge **342** and/or LAN **312** were to fail, host **356** would be able to communicate with LAN **310** via LAN **314** and bridge **344**. A similar situation would result if bridge **344** and/or LAN **314**

12

US 8,051,211 B2

5      6

were to fail. Additionally, bridge **344** and host **356** are configured for link aggregation, allowing both LAN **312**-**314** to be simultaneously utilized for transmitting information to and from host **356** and allowing host **356** to be seen from LAN **310** as having a single IP address.

In similar fashion, host **358** is coupled to LAN **310** via, at least, LANs **316**-**318** and bridges **342**-**344**. If bridge **344** and/or LAN **318** were to fail, host **358** would still be able to communicate with LAN **310** via LAN **316** and bridge **342**. A similar situation would result if bridge **342** and/or LAN **316** were to fail. Additionally, bridge **342** and host **358** are configured for link aggregation, allowing both LANs **316**-**318** to be simultaneously utilized for transmitting information to and from host **358** and allowing host **358** to be seen from LAN **310** as having a single IP address.

It should be understood that network **300** is provided as an exemplary network in which multi-bridge LAN aggregation in accordance with the present invention can be implemented. Other embodiments of the present invention may be implemented in networks other than network **300**, and consequently the present invention should not be limited to network **300**.

Exemplary Multi-Bridge LAN Aggregation Configuration

FIG. **3**B illustrates a portion of network **300** in closer detail. The portion illustrated is provided only for aiding in the description of the present invention. As illustrated in FIG. **3**B, LAN **310** is coupled to intermediate network devices **342** and **344**. In one embodiment of the present invention, intermediate network devices **342** and **344** are Layer **2** (or "L2") Ethernet switches. A L2 switch, as is commonly known, is a switch which operates on the data-link layer of the OSI reference model. In the described embodiment, intermediate network devices **342** and **344** are bridges. Bridges **342** and **344** include ports **352** (e.g., ports A0-A1 and ports B0-B1, respectively) and bridge-interconnect ports **366**. In the described embodiment, bridge-interconnect port **366** represents a logical port. Many logical ports may be multiplexed over a single physical port (or multiple physical ports, if Link Aggregation is employed). Included in bridge-interconnect ports **366** is sub-port A**99**.**0** which is logically coupled to port A0. Ports **352** allow bridges **342** and **344** to be physically coupled to LANs **310**-**314**. Bridge **342** and **344** are coupled to each other via inter-bridge link **364**. In one embodiment of the present invention, inter-bridge link **364** represents one LAN or many LANs Link Aggregated together.

Host **356** is connected to both bridges **342** and **344** through network interfaces **360** (e.g., S0 and S1). Together, network interfaces **360** are configured as one virtual network interface **362** (having one IP address for virtual network interface **362**) in accordance with the present invention. In the described embodiment, network interfaces **360** are Ethernet interfaces. In accordance with the present invention, bridge **342** is configured with a pass-through path **353** between port A0 and sub-port A**99**.**0** (a description of how this configuration is accomplished is described in greater detail below). Any frames transmitted to port A0 are sent directly to sub-port A**99**.**0** without any examination by bridge **320**. Similarly, any frames transmitted to sub-port A**99**.**0** are sent directly to port A0 without any examination by bridge **320**. As used herein, tunneling is used to refer to transmitting a frame without examination. For example, when a bridge receives a frame, it generally examines the frame to determine the corresponding LAN Segment to forward the frame to. Additionally, a bridge will process the frame according to a number of protocols. However, in accordance with the present invention, bridge **342** is configured to internally transmit a frame between bridge inter-connect port **366** and port A0 directly, without

such examination. Thus, port A0 on bridge **320** is slaved through sub-port A**99**.**0** to sub-port B**99**.**0** of bridge **344**. Bridge **342** is essentially transparent to bridge **344** and host **356**.

From the perspective of bridge **344**, sub-port B**99**.**0** is treated as a separate interface, and link aggregation is configured on bridge **344** for port B0 and sub-port B**99**.**0**. Additionally, from the perspective of host **356**, LANs **312** and **314** are "seen" as being directly connected to bridge **344**, by virtue of the pas-through path **353**. Thus, in the described embodiment, there are two paths between host **356** and LAN **310**, with one of the paths transparently traversing bridge **342** (e.g., via pas-through path **353**).

Redundancy and Failure Recovery

With the benefits of Link Aggregation, one IP address, represented by virtual network interface **362**, is associated with host **356**, even though both network interfaces S**0** and S**1** are coupled to LAN **310**. The present invention thus provides the benefit of bridge redundancy and link redundancy between host **356** and LAN **310** with host **356** seen by LAN **310** as having a single IP address via Link Aggregation. If LAN **312** and/or bridge **342** were to fail, link redundancy on host **356** would detect the failure and "shift" all communications to LAN **314** and bridge **344**.

In response to the loss of LAN **314** and/or bridge **344**, however, bridge **342** would reconfigure port A0 as a "normal" bridge port, discard the use of sub-port A**99**.**0**, and also begin executing Link Aggregation (i.e., port A0 would no longer be slaved through sub-port A**99**.**0** to sub-port B**99**.**0** of bridge **344**). With the reconfiguration of port A0 as a bridge port, and without pas-through path **353**, host **356** (i.e., the link aggregation on host **356**) no longer sees LANs **312** and **314** as being directly coupled to bridge **344**. Rather, LAN **312** would be seen as coupled to bridge **342**, and LAN **314** would be seen as coupled to bridge **344**, or not seen at all, depending on the extent of the failure. Host **356** (via a link redundancy protocol such as LACP or PagP) would see this as a re-connection of network interface S**0** to another device, and abort the aggregation. Host **356** would then choose either LAN **312** or LAN **314** for its virtual IP interface, according to the usage of the aggregation protocol. A similar reconfiguration would occur if inter-bridge link **364** connecting bridges **342** and **344** were to fail. Because bridges **342** and **344** are able to operate independently from each other (e.g., no "learning" is required between bridges **342** and **344**), host **356** can preferably remain in communication with network **310** even if inter-bridge link **364** were to fail.

In addition to the benefits of bridge redundancy and link redundancy between host **356** and LAN **310**, the present invention also provides for the advantages of link redundancy in a multi-bridge configuration. In other words, even though host **356** is configured to utilize multiple network interfaces **360** in communicating with LAN **310**, host **356** is preferably able to interface with LAN **310** with a single IP address as a result of virtual network interface **362** configured by link aggregation. Being associated with a single IP address provides for easier management of host **356** (and network **300**), and eliminates any confusion as to which address IP address should be in communicating with host **356**. Further, with link redundancy, the bandwidth between host **356** and LAN **310** is increased (e.g., doubled) since LANs **312** and **314** are able to share the load of the traffic.

Once any failures of bridge **342**, bridge **344**, LANs **312** and **314**, and/or inter-bridge link **364** are corrected, Link Aggregation protocol would resume utilizing both bridges **342** and **344** in accordance with the present invention (e.g., bridge **342** is able to automatically reconfigure port A0 as a pass-through

13

US 8,051,211 B2

7

port once a failure on bridge 344, for example, has been corrected.) Although the present embodiment is described as including LANs 312 and 314 for use in link aggregation, it is recognized that any number of LANs (and ports and network interfaces) may be used. Additionally, the LANs may pass through any number of bridges, and in order to increase bandwidth without a corresponding increase in reliability, multiple paths may be tunneled through one bridge.

Exemplary Bridge Architecture

FIG. 4 is a block diagram of a bridge 400 in accordance with one embodiment of the present invention. Bridge 400 includes ports 402 (e.g., port 0-port N) and a multi-bridge engine 404. Multi-bridge engine 404 provides forwarding and pass-through capabilities to bridge 400 which allow data to either be forwarded by bridge 400 (e.g., processing a frame received by bridge 400 according to a number of different protocols) or passed through bridge 400 (e.g., passing a frame through bridge 400 with little or no processing of the frame) in accordance with the present invention.

Multi-bridge engine 404 includes a bridge-forwarding engine 406, aggregated-bridge ports 408, tunnel engines 410, and a bridge-interconnect port 412. It will be recognized that a number of different types of mux/demux technologies may be used in the present invention. For example, Layer 3 tunnels, a number of dedicated Ethernets, and/or an array of ATM emulated LANS. Bridge-forwarding engine 406 receives data on one or more ports (e.g., P1-PN), examines the data according to a number of protocols, and forwards the data out the one or more ports P1-PN. Aggregated bridge ports 408 provide link aggregation support for bridge 400 in accordance with the present invention. Tunnel engines 410 are utilized for transparently passing data through bridge 400 (e.g., tunnel engine 410 may strip of an encapsulated header on a frame passed through bridge 400). It will be recognized that bridge forwarding engine 406, aggregated bridge ports 408, and tunnel engines 410 may be implemented in hardware or software.

Bridge-interconnect port 412 internally routes data to bridge forwarding engine 406, aggregated bridge ports 408, and/or tunnel engine 410 depending on, for example, information associated with the data (e.g., an encapsulation tag 506 such as that shown in FIG. 5). Additionally, bridge-interconnect port 412 receives data from bridge forwarding engine 406, aggregated bridge ports 408 and/or tunnel engine 410 and adds information to the data (e.g., encapsulates data with an encapsulation tag 506 such as that shown in FIG. 5). Bridge-interconnect port 412 includes sub-ports 414 (e.g., sub-port 0-sub-port N) and multiplexer/de-multiplexer 416. Sub-ports 414 allow data to be transmitted between inter-bridge link 418 and various internal objects of bridge 400 (e.g., bridge forwarding engine 406, aggregated bridge ports 408, tunnel engine 410, and/or ports 402). Multiplexer/de-multiplexer 416 provides encapsulation and de-encapsulation to frames received by bridge-inter-connect port 412. Bridge 400 also includes one or more buffers (not shown) or memory hierarchies (not shown) to temporarily store frames received on, for example, ports 402 and/or bridge-interconnect port 412.

Bridge 400 is coupled, via inter-bridge link 418, to a bridge 420 (similar to bridge 400, and not shown for simplicity of illustration). Within bridge 400, sub-port 0 is coupled to P1 of bridge forwarding engine 406. P1 represents a LAN linking bridge 400 to bridge 420. A similar configuration is provided in bridge 420. In addition, P1 is utilized to transmit a frame between bridge 400 and 420 at a periodic frequency in order for bridge 400 and 420 to detect a failure in communication (e.g., the loss of inter-bridge link 418) between bridge 400

8

and bridge 420. For example, in one embodiment of the present invention, bridge 400 is configured, via P1 of bridge forwarding engine 406, to transmit a keep-alive frame to bridge 420. Similarly, bridge 420 is configured to receive the keep-alive frame, and transmit the keep alive frame back to bridge 400. This process is repeated with a frequency of preferably 1 second or less. The loss of three keep-alive frames (either consecutively or within a defined time) results in a reconfiguration of bridges 400 and 420. The home bridge (which is the bridge not configured as the tunneling bridge) will consider the encapsulated link over inter-bridge link 418 as failed. The tunneling bridge will cease pass-through capabilities (but only temporarily, since automatic configuration of pass-through is possible once communication is re-established) and operate with forwarding capabilities.

Each tunneling sub-port of bridge 400 corresponds (is remoted to) an aggregated sub-port on bridge 420. Similarly, each aggregated sub-port on bride 420 corresponds (is remoted to) a tunneling sub-port on bridge 420. For example, sub-ports 1 and 3 of bridge 400 are configured to be remoted by sub-ports of bridge 420. In other words, sub-port 1 (or sub-port 2, or sub-port 3) of bridge 400 is coupled to a sub-port of bridge 420 that is configured to tunnel the frames through bridge 420. Similarly, sub-ports 4 and 5, which are configured on bridge 400 as pass-through ports via tunnel engines 410, are remoted to sub-ports of bridge 420, which, on bridge 420, are configured as aggregated bridge ports.

It will be noted that the variable identifier "N" is used in several instances in the figures described herein to more simply designate the final element of a series of related or similar elements. The repeated use of such variable identifiers is not meant to necessarily imply a correlation between the sizes of such series of elements, although such correlation may exist. The use of such variable identifiers does not require that each series of elements has the same number of elements as another series delimited by the same variable identifier. Rather, in each instance of use, the variable identified by "N" (or any other such identifier) may hold the same or a different value than other instances of the same variable identifier.

Moreover, regarding the signals described herein, those skilled in the art will recognize that a signal may be directly transmitted from a first block to a second block, or a signal may be modified (e.g., amplified, attenuated, delayed, latched, buffered, inverted, filtered or otherwise modified) between the blocks. Although the signals of the above described embodiment are characterized as transmitted from one block to the next, other embodiments of the present invention may include modified signals in place of such directly transmitted signals as long as the informational and/or functional aspect of the signal is transmitted between blocks. To some extent, a signal input at a second block may be conceptualized as a second signal derived from a first signal output from a first block due to physical limitations of the circuitry involved (e.g., there will inevitably be some attenuation and delay). Therefore, as used herein, a second signal derived from a first signal includes the first signal or any modifications to the first signal, whether due to circuit limitations or due to passage through other circuit elements which do not change the informational and/or final functional aspect of the first signal.

The foregoing described embodiment wherein the different components are contained within different other components (e.g., the various elements of bridge 400). It is to be understood that such depicted architectures are merely examples, and that in fact many other architectures can be implemented which achieve the same functionality. In an abstract, but still definite sense, any arrangement of compo-

14

US 8,051,211 B2

9

nents to achieve the same functionality is effectively "associated" such that the desired functionality is achieved. Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of architectures or intermediate components. Likewise, any two components so associated can also be viewed as being "operably connected", or "operably coupled", to each other to achieve the desired functionality.

Encapsulation

FIG. 5 is a block diagram of encapsulated data (e.g., Ethernet frame 500) in accordance with one embodiment of the present invention. In one embodiment of the present invention bridge-interconnect port 412 encapsulates (e.g., includes a tag within, or appended to, frame 500) and de-encapsulates (e.g., examines fields in frame 500 and/or removes tags from frame 500) frame 500 on input buffer logic (IBL) with a multi-bridge tag. It will be recognized that subtle variations of the encapsulation methods described herein may be incorporated with objects other than Ethernet frames. Further, it will be recognized that fields other than those shown in FIG. 5 may be included in, or removed from, frame 500.

In the present embodiment, frame 500 includes destination media access control (mac) address 502 and source mac address 504, representing the address of a destination host and the address of a source host of frame 500. Frame 500 also includes tags 506 and 508, length/Ethertype field 510, data field 512 and cyclical redundancy check (CRC) field 514.

Tag 506 is a multi-bridge tag preferably used to indicate the sub-port number to which frame 500 should be sent. In one embodiment of the present invention, tag 506 is a 4-byte virtual local area network (VLAN) tag as defined in IEEE std 802.1Q-1998. In one embodiment of the present invention, tag 506 includes 2-byte ethertype field 506(*a*), 3 bit priority field 506(*b*), 1 bit canonical format indicator (CFI) field 506 (*c*), and 12-bit VLAN-ID field. It is preferable that ethertype field 506(*a*) be set to 0x8100 and priority field 506(*b*) set according to the relative priority of the corresponding subport. Additionally, CFI field 506(*c*) is preferably set to 0 and VLAN-ID field 506(*d*) is preferably used to indicate the sub-port of a bridge (e.g., bridge 400) which should transmit/ receive frame 500. Although tag 506 is a VLAN tag, it is not necessary for a bridge or host to be VLAN-aware in order to process tag 506. A tag 508, optionally included in frame 500, is also preferably a VLAN tag, however the settings of tag 508 are dependent upon, inter alia, the topology of the virtual local area network.

Alternative Embodiments

FIG. 6 illustrates another embodiment of the present invention. A host 602 is coupled to a LAN 604 via LANs 606 and 608 and bridges 610 and 612. Host 602 includes a number of (e.g., 2) network interfaces 614. Together, network interfaces 614 are represented as one virtual network interface 616 (having one IP address for virtual network interface 616). Bridge 610 includes ports 618 (e.g., ports A0-A4). Bridge 612 includes ports 618 (e.g., ports B0-B4). A number of (e.g., 2) inter-bridge LANs 624 couple bridge 610 and 612 to each other via bridge ports A2-B2 and A3-B3, respectively.

Port A0 of bridge 610 is tunneled to port A3, and port A1 of bridge 610 is tunneled to port A2. In other words, bridge 610 configures ports A0 and A1 to be slaved to bridge-interconnect ports A2 and A3 and to ports B2 and B3, respectively. Bridge 612 and host 602 are to aggregate LANs 606 and 608 and inter-bridge LANs 624. In other words, LANs 606 and 608 and inter-bridge LANS 624 appear as a logical LAN

10

between bridge 612 and host 602, with bridge 610 being transparent to both bridge 612 and 602.

As can be seen from the presently described embodiment of FIG. 6, rather than utilizing, inter alia, one inter-bridge LAN between multiple bridges and a bridge inter-connect port, the embodiment of FIG. 6 provides one physical connection between each port A2, A3 and B2, B3 respectively, and no encapsulation/de-encapsulation is necessary. Such a configuration may be used in a network with few hosts, making it easier to physically connect multiple ports via a number of inter-bridge LANs 624. However, for larger configurations, it is preferable to utilize the embodiment illustrated in FIG. 5, which allows for multiple bridges to be coupled with, at a minimum, one inter-bridge link (although more may be used).

Configuration and Operation

FIGS. 7(A-C) are flow charts illustrating a process of aggregating a plurality of LANs coupling a host to a first and second intermediate network device, according to one embodiment of the present invention. For clarity of description, the flow charts of FIG. 7 are described with reference to FIGS. 3 and 4.

Initially, a tunneling bridge (e.g., a first intermediate device, bridge 342) is configured (step 702). The tunneling bridge is a bridge which provides a pass-through path. A tunneling bridge may also be a home bridge, which is a bridge that is configured for link aggregation with respect to a given host. To configure the tunneling bridge, the virtual ports (e.g., sub-ports 414) are configured (step 704) and a pass-through path (e.g., pass-through pass 353) is configured (step 706). In configuring the virtual ports, one or more physical ports of the tunneling bridge are mapped to a number of virtual ports. Each virtual port may then be mapped to a number of internal destinations with the tunneling bridge (e.g., bridge forwarding engine 406, aggregated bridge ports 408, or ports 402). To configure the pass-through path, a virtual port is mapped directly to another physical port of the tunneling bridge via a tunnel engine (step 708). For example, referring to FIG. 4 sub-port 4 is mapped directly to port 5 via tunnel engine 410 to provide a pass-through pass from sub-port 4 to port 5. In this configuration, a frame received by sub-port 4 will preferably be immediately transmitted directly to port 5.

A host (e.g., host 356) is configured in step 710. Initially, to configure the host, a number of network interfaces (e.g., S0 and S1) are aggregated (i.e., collectively joined or mapped) to provide a virtual network interface (e.g., network interface 362) (step 712). In one embodiment of the present invention, Link Aggregation is used for the aggregation. Next, an internet protocol (IP) address is generated for the virtual network interface (step 714). With the generated IP address, data addressed to the same IP address may be received on either network interface S0 or S1.

In step 716, the home bridge (e.g. a second intermediate device, bridge 344), is configured (as mentioned above, a home bridge can also serve as a tunneling bridge). To configure the home bridge, the virtual ports (e.g., sub-ports 414) are configured (step 718) and the ports (e.g., ports B0 and bridge-interconnect port 366) are aggregated (step 720). In one embodiment of the present invention, Link Aggregation is used for the aggregation.

As a result of the configuration of the tunneling bridge, Link Aggregation on bridge 344 sees bridge-interconnect port 366 as directly coupled to host 356, even though bridge 342 is coupled between bridge-interconnect port 366 and host 356. Similarly, Link Aggregation on host 356 sees virtual

15

US 8,051,211 B2

11                                                  12

network interface 362 as directly coupled to bridge 344, even though bridge 342 is coupled between virtual network interface 362 and host 356.

FIG. 7B is a flow chart illustrating tunneling a frame from a home bridge (e.g., bridge 344) to a tunneling bridge (e.g., bridge 342), in accordance with one embodiment of the present invention. It is assumed that the destination address of the frame is the IP address corresponding to the virtual network interface of the host. Initially, when a frame is sent from the home bridge to the tunneling bridge, the frame is encapsulated (step 722). In encapsulating a frame, a tag (e.g., tag 506 of FIG. 5) is generated (step 724) and added to the frame (step 732). In the present embodiment, the tag is generated by using a IEEE Std. 802.1Q-1998. The CFI bit is set to 0, the user priority field is set to the priority of the virtual port, and the VLAN-ID field is set to the virtual port number (steps 726, 728, and 730, respectively). Once the tag is encapsulated, it is transmitted to the tunneling bridge (step 734).

The tunneling bridge de-encapsulates the frame (step 736). In de-encapsulating the frame, the virtual port number is determined (step 738) and the frame is received by the virtual port corresponding to the determined virtual port number (step 740). Next, the frame is transmitted directly to the physical port to which the virtual port is mapped (step 742) (e.g., port 5, which is mapped to sub-port 4) and the frame is then transmitted to the host (step 744). FIG. 7C is a flow chart similar to 7B, but from the perspective of transmitting a frame from a host to a home bridge (e.g., bridge 344).

As noted, FIG. 3 depicts a flow diagram illustrating a process according to one embodiment of the present invention. It is appreciated that operations discussed herein may consist of directly entered commands by a computer system user or by steps executed by application specific hardware modules, but the preferred embodiment includes steps executed by software modules. The functionality of steps referred to herein may correspond to the functionality of modules or portions of modules.

The operations referred to herein may be modules or portions of modules (e.g., software, firmware or hardware modules). For example, although the described embodiment includes software modules and/or includes manually entered user commands, the various example modules may be application specific hardware modules. The software modules discussed herein may include script, batch or other executable files, or combinations and/or portions of such files. The software modules may include a computer program or subroutines thereof encoded on computer-readable media.

Additionally, those skilled in the art will recognize that the boundaries between modules are merely illustrative and alternative embodiments may merge modules or impose an alternative decomposition of functionality of modules. For example, the modules discussed herein may be decomposed into submodules to be executed as multiple computer processes, and, optionally, on multiple computers. Moreover, alternative embodiments may combine multiple instances of a particular module or submodule. Furthermore, those skilled in the art will recognize that the operations described in example embodiment are for illustration only. Operations may be combined or the functionality of the operations may be distributed in additional operations in accordance with the invention.

Alternatively, such actions may be embodied in the structure of circuitry that implements such functionality, such as the micro-code of a complex instruction set computer (CISC), firmware programmed into programmable or erasable/programmable devices, the configuration of a field-programmable gate array (FPGA), the design of a gate array or full-custom application-specific integrated circuit (ASIC), or the like.

Each of the blocks of the flow diagram may be executed by a module (e.g., a software module) or a portion of a module or a computer system user. Thus, the above described method, the operations thereof and modules therefor may be executed on a computer system configured to execute the operations of the method and/or may be executed from computer-readable media. The method may be embodied in a machine-readable and/or computer-readable medium for configuring a computer system to execute the method. Thus, the software modules may be stored within and/or transmitted to a computer system memory to configure the computer system to perform the functions of the module.

Such a computer system normally processes information according to a program (a list of internally stored instructions such as a particular application program and/or an operating system) and produces resultant output information via I/O devices. A computer process typically includes an executing (running) program or portion of a program, current program values and state information, and the resources used by the operating system to manage the execution of the process. A parent process may spawn other, child processes to help perform the overall functionality of the parent process. Because the parent process specifically spawns the child processes to perform a portion of the overall functionality of the parent process, the functions performed by child processes (and grandchild processes, etc.) may sometimes be described as being performed by the parent process.

Such a computer system typically includes multiple computer processes executing "concurrently." Often, a computer system includes a single processing unit which is capable of supporting many active processes alternately. Although multiple processes may appear to be executing concurrently, at any given point in time only one process is actually executed by the single processing unit. By rapidly changing the process executing, a computer system gives the appearance of concurrent process execution. The ability of a computer system to multiplex the computer system's resources among multiple processes in various stages of execution is called multitasking. Systems with multiple processing units, which by definition can support true concurrent processing, are called multiprocessing systems. Active processes are often referred to as executing concurrently when such processes are executed in a multitasking and/or a multiprocessing environment.

The software modules described herein may be received by such a computer system, for example, from computer readable media. The computer readable media may be permanently, removably or remotely coupled to the computer system. The computer readable media may non-exclusively include, for example, any number of the following: magnetic storage media including disk and tape storage media optical storage media such as compact disk media (e.g., CD-ROM, CD-R, etc.) and digital video disk storage media nonvolatile memory storage memory including semiconductor-based memory units such as FLASH memory, EEPROM, EPROM, ROM or application specific integrated circuits volatile storage media including registers, buffers or caches, main memory, RAM, and the like and data transmission media including computer network, point-to-point telecommunication, and carrier wave transmission media. In a UNIX-based embodiment, the software modules may be embodied in a file which may be a device, a terminal, a local or remote file, a socket, a network connection, a signal, or other expedient of communication or state change. Other new and various types

16

US 8,051,211 B2

13

of computer-readable media may be used to store and/or transmit the software modules discussed herein.

While particular embodiments of the present invention have been shown and described, it will be obvious to those skilled in the art that, based upon the teachings herein, changes and modifications may be made without departing from this invention and its broader aspects and, therefore, the appended claims are to encompass within their scope all such changes and modifications as are within the true spirit and scope of this invention. Furthermore, it is to be understood that the invention is solely defined by the appended claims.

What is claimed is:

**1**. A method comprising:

aggregating a plurality of LANs, wherein

said aggregating comprises aggregating a first LAN and a second LAN,

said first LAN couples a host to a first intermediate device and said second LAN couples said host to a second intermediate network device, said plurality of LANs comprising said first LAN and said second LAN, and

subsequent to said aggregating, said first LAN and said second LAN are both usable to simultaneously transmit information from said host to said second intermediate network device.

**2**. The method of claim **1**, further comprising:

tunneling said first LAN with a third LAN through said first intermediate network device, said plurality of LANs comprising said third LAN.

**3**. The method of claim **2**, wherein said aggregating comprises:

aggregating a first and a second network interface of said host to provide a virtual network interface, wherein

said first network interface is coupled to said first intermediate network device over said first LAN, and

said second network interface is coupled to said second intermediate network device over said second LAN.

**4**. The method of claim **3**, further comprising:

generating an interne protocol address for said virtual network interface;

transmitting a first frame addressed to said internet protocol address from said second intermediate network device via said first LAN; and

transmitting a second frame addressed to said internet protocol address from said second intermediate network device via said second LAN.

**5**. The method of claim **4**, further comprising:

transmitting said first and said second frame simultaneously.

**6**. The method of claim **2** wherein said aggregating comprises:

aggregating a first and a second port of said second intermediate network device, wherein

said first port is coupled to said first intermediate network device over said third LAN, and

said second port is coupled to said host over said second LAN.

**7**. The method of claim **2**, wherein said tunneling comprises:

configuring a pass-through path on said first intermediate network device.

**8**. The method of claim **7**, wherein said tunneling further comprises:

coupling a first port of said first intermediate network device to a second port of said first intermediate network device.

14

**9**. The method of claim **8**, wherein said tunneling further comprises:

transmitting a frame directly from said first port of said first intermediate network device to said second port of said first intermediate network device.

**10**. The method of claim **7**, further comprising:

configuring a plurality of virtual ports on said first intermediate network device; and

mapping a virtual port of said plurality directly to a physical port of said first intermediate network device.

**11**. The method of claim **10**, wherein said tunneling comprises:

encapsulating a frame with a virtual port number;

transmitting said frame to said first intermediate network device;

de-encapsulating said frame to determine said virtual port number; and

directly transmitting said frame from said virtual port to said physical port.

**12**. A computer program product, said computer program product comprising:

a non-transitory computer readable media, wherein the non-transitory computer readable medium stores a first set of instructions, executable on an intermediate network device, configured to aggregate a plurality of LANs, wherein said first set of instructions is configured to aggregate a first LAN and a second LAN,

said first LAN couples a host to a first intermediate device and said second LAN couples said host to a second intermediate network device, said plurality of LANs comprising said first LAN and said second LAN, and

subsequent to said aggregating, said first LAN and said second LAN are both usable to simultaneously transmit information from said host to said second intermediate network device.

**13**. The computer program product of claim **12**, further comprising:

a second set of instructions, executable on said intermediate network device, configured to tunnel a first LAN with a third LAN through said first intermediate network device, said plurality of LANs comprising said third LAN.

**14**. The computer program product of claim **13**, wherein said first set of instructions comprises:

a first sub-set of instructions, executable on said intermediate network device, configured to aggregate a first and a second network interface of said host to provide a virtual network interface, wherein

said first network interface is coupled to said first intermediate network device over said first LAN, and

said second network interface is coupled to said second intermediate network device over said second LAN.

**15**. The computer program product of claim **14**, further comprising:

a third set of instructions, executable on said intermediate network device, configured to generate an internet protocol address for said virtual network interface;

a fourth set of instructions, executable on said intermediate network device, configured to transmit a first frame addressed to said internet protocol address from said second intermediate network device via said first LAN; and

a fifth set of instructions, executable on said intermediate network device, configured to transmit a second frame

17

US 8,051,211 B2

15

addressed to said internet protocol address from said second intermediate network device via said second LAN.

**16.** The computer program product of claim **15**, further comprising:

a sixth set of instructions, executable on said intermediate network device, configured to transmit said first and said second frame simultaneously.

**17.** The computer program product of claim **13**, wherein said first set of instructions comprises:

a first sub-set of instructions, executable on said intermediate network device, configured to aggregate a first and a second port of said second intermediate network device, wherein

said first port is coupled to said first intermediate network device over said third LAN, and

said second port is coupled to said host over said second LAN.

**18.** The computer program product of claim **13**, wherein said second set of instructions comprises:

a first sub-set of instructions, executable on said intermediate network device, configured to provide a pass-through path on said first intermediate network device.

**19.** The computer program product of claim **18**, wherein said second set of instructions further comprises:

a second sub-set of instructions, executable on said intermediate network device, configured to couple a first port of said first intermediate network device to a second port of said first intermediate network device.

**20.** The computer program product of claim **19**, wherein said second set of instructions further comprises:

a third sub-set of instructions, executable on said intermediate network device, configured to transmit a frame directly from said first port of said first intermediate network device to said second port of said intermediate network device.

**21.** The computer program product of claim **18**, further comprising:

a third set of instructions, executable on said intermediate network device, configured to configure a plurality of virtual ports on said first intermediate network device; and

a fourth set of instructions, executable on said intermediate network device, configured to map a virtual port of said plurality directly to a physical port of said first intermediate network device.

**22.** The computer program product of claim **21**, wherein said second set of instructions comprises:

a first sub-set of instructions, executable on said intermediate network device, configured to encapsulate a frame with a virtual port number;

a second sub-set of instructions, executable on said intermediate network device, configured to transmit said frame to said first intermediate network device;

a third sub-set of instructions, executable on said intermediate network device, configured to de-encapsulate said frame to determine said virtual port number; and

a fourth sub-set of instructions, executable on said intermediate network device, configured to directly transmit said frame from said virtual port to said physical port.

**23.** A system comprising:

means for aggregating a plurality of LANs; and

means for tunneling a first LAN with a second LAN through said first intermediate network device, said plurality of LANs comprising said first and said second LAN, wherein

said aggregating comprises aggregating said first LAN and a third LAN,

16

said first LAN couples a host to a first intermediate device and said third LAN couples said host to a second intermediate network device, and

subsequent to said aggregating, said first LAN and said second LAN are both usable to simultaneously transmit information from said host to said second intermediate network device.

**24.** The system of claim **23**, wherein said aggregating comprises:

aggregating a first and a second network interface of said host to provide a virtual network interface, wherein

said first network interface is coupled to said first intermediate network device over said first LAN, and

said second network interface is coupled to said second intermediate network device over said third LAN.

**25.** The system of claim **24**, further comprising:

means for generating an internet protocol address for said virtual network interface;

means for transmitting a first frame addressed to said internet protocol address from said second intermediate network device via said first LAN; and

means for transmitting a second frame addressed to said internet protocol address from said second intermediate network device via said third LAN.

**26.** The system of claim **25**, further comprising:

means for transmitting said first and said second frame simultaneously.

**27.** The system of claim **23**, wherein said aggregating comprises:

means for aggregating a first and a second port of said second intermediate network device, wherein

said first port is coupled to said first intermediate network device over said second LAN, and

said second port is coupled to said host over said third LAN.

**28.** The system of claim **23**, wherein said tunneling comprises:

means for configuring a pass-through path on said first intermediate network device.

**29.** The system of claim **28**, wherein said tunneling further comprises:

means for coupling a first port of said first intermediate network device to a second port of said first intermediate network device.

**30.** The system of claim **29**, wherein said tunneling further comprises:

means for transmitting a frame directly from said first port of said first intermediate network device to said second port of said intermediate network device.

**31.** The system of claim **30**, further comprising:

means for configuring a plurality of virtual ports on said first intermediate network device; and

means for mapping a virtual port of said plurality directly to a physical port of said first intermediate network device.

**32.** The system of claim **31**, wherein said tunneling comprises:

means for encapsulating a frame with a virtual port number;

means for transmitting said frame to said first intermediate network device;

means for de-encapsulating said frame to determine said virtual port number; and

means for directly transmitting said frame from said virtual port to said physical port.

\* \* \* \* \*

18

## CERTIFICATE OF SERVICE

I certify that on May 19, 2017, I electronically filed the foregoing

Principal Brief of Appellant using the Court's CM/ECF filing system.  Counsel

for appellee were electronically served by and through the Court's CM/ECF

filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b).


/s/Lauren A. Degnan
Lauren A. Degnan

## CERTIFICATE OF COMPLIANCE

The Principal Brief of Appellant is submitted in accordance with the type-volume limitation of Federal Circuit Rule 32(a).  The Brief contains 8,251 words, excluding the parts of the brief exempted by Fed. Fed. Cir. R 32(b).  This Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times new Roman, 14 Point.

Dated:  May 19, 2017          /s/Lauren A. Degnan
                              Lauren A. Degnan